**TENNECO OIL COMPANY,**
**Plaintiff-Appellee,**

v.

**FEDERAL ENERGY ADMINISTRA-**
**TION and John F. O'Leary, Admin-**
**istrator, Defendants-Appellants.**

**No. 5–40.**

Temporary Emergency Court of Appeals.

Argued Sept. 28, 1979.

Decided Dec. 3, 1979.

Rehearing Denied Jan. 18, 1980.

Christopher M. Was, Dept: of Energy, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., C. Max Vassanelli and Caroline C. Mueller, Dept. of Justice, and Arthur E. Gowran, Dept. of Energy, Washington, D. C. were on the brief for defendants-appellants.

John P. Mathis, Baker & Botts, Washington, D. C., with whom Charles M. Darling, IV, and Kirk K. Van Tine, Washington, D. C., David M. Lacey, Baker & Botts, Houston, Tex., and Ralph J. Maynard, Alfred B. Smith, Jr., Tenneco Oil Company, Houston, Tex., were on the brief for plaintiff-appellee.

Before INGRAHAM, MORGAN and GEWIN, Judges.

LEWIS R. MORGAN, Judge.

The central issue in this case is whether the use by Tenneco of its own oil on its own oil producing properties was a "sale" under the terms of the petroleum price control regulations. The district court found, and we agree, that the Federal Energy Administration's (FEA)[1] application of the price control regulations to the facts in this case was erroneous.

## I. THE FACTS

The regulations in question were first promulgated by the Cost of Living Council (CLC)[2] under the authority granted by the Economic Stabilization Act of 1970.[3] The petroleum price control authority was inherited by the FEA under the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751, et seq., and the FEA carried forward the regulations first issued by the CLC in substantially identical form.[4]

The regulations created a two-tier pricing system which placed a ceiling on "old" oil but exempted "new" oil from price controls.[5] In simple terms, new oil represented the amount of increase in production from a well since 1972. Old oil was that portion of production that was equal to what was produced from the well in 1972. It is the language of section 212.72 of the regulations, defining new oil, that is the focus of this controversy. To calculate the amount of new oil produced in a given month, producers were to determine the amount of crude petroleum *"produced and sold"* from a property in that month and subtract the base production control level (BPCL) for that property. The BPCL was defined as the amount of crude petroleum *"produced and sold"* from that property during the same month in 1972. The purpose of the two-tier pricing system was to dampen the inflationary impact of world market oil prices while stimulating the production of additional domestic supplies of oil. New oil was exempted from price controls as an incentive for intensified domestic production.[6] These objectives were recognized approvingly by Congress in the Conference Report which accompanied the Emergency Petroleum Allocation Act.[7]

Tenneco is the owner and operator of an oil producing property known as the "Fee C" in Kern County, California. During 1972, Tenneco delivered oil produced from

1. The complaint in this case was filed against the FEA, although the current successor to the FEA's responsibilities is the Department of Energy, pursuant to the Department of Energy Organization Act, 42 U.S.C. §§ 7101, et seq., and Executive Order No. 12009, 42 Fed.Reg. 46267 (1977). For the sake of simplicity and consistency, however, this opinion refers only to the FEA.

2. 38 Fed.Reg. 22536 (1973).

3. Pub.L. 91–379, 84 Stat. 799, as amended by Pub.L. 91–558, 84 Stat. 1468; Pub.L. 92–8, 85 Stat. 13; Pub.L. 92–15, 85 Stat. 38; Pub.L. 92–210, 85 Stat. 743; Pub.L. 93–28, 87 Stat. 27.

4. 39 Fed.Reg. 1924 (1974) (codified as amended in 10 C.F.R. pt. 212).

5. 10 C.F.R. § 212.73. The two-tier pricing system is described in greater detail in 525 F.2d 1068 (Em.App.1975) (*en banc*).

6. Preamble to Notice of Proposed Rulemaking, 38 Fed.Reg. 19467, July 20, 1973.

7. H.R.Rep. No. 628, 93rd Cong., 1st Sess. 26, *reprinted in* [1973] U.S.Code Cong. & Admin. News, pp. 2582, 2688, 2703.

its Fee C property to West Coast Oil Company under a processing agreement. Under the terms of the Tenneco-West Coast agreement, West Coast "topped" the lightest hydrocarbons amounting to about 20 percent of the oil delivered by Tenneco, and returned the remaining 80 percent to Tenneco. Except as to the oil retained by West Coast, title to the oil delivered to West Coast remained at all times in Tenneco. The oil returned to Tenneco was used to fuel steam generators located at several of its oil producing properties, including the Fee C. The steam from these generators was injected into oil reservoirs to aid in the recovery of crude oil.

The processing agreement expired on December 21, 1973, and the parties chose not to renew it. Rather than using refined oil to fuel its Fee C generators, Tenneco at this point began to burn unprocessed crude oil produced from the Fee C. The remaining Fee C production was sold to West Coast under the terms of a new sale agreement. In August 1974, Tenneco began to sell all of its Fee C production instead of burning any crude Fee C oil on site. Tenneco took this course of action after it concluded that the oil processed by West Coast in 1972 and burned at Tenneco production sites was not "sold" and was therefore not includable in the BPCL. The effect of excluding these quantities of oil from the BPCL was that Tenneco classified most of its 1974 production from the Fee C as new oil to be sold at free market prices. Thereafter, Tenneco obtained residual fuel oil for its steam generators on the Fee C from other sources, and sold all of its Fee C oil to West Coast. In November 1974, Tenneco terminated its sales of crude oil to West Coast because of a dispute over the proper calculation of the BPCL for the Fee C property.

It is undisputed that gross production from the Fee C declined from 1972 to 1974. The "new" oil produced by the Fee C is merely that amount of oil consumed by Tenneco in 1972 but sold by Tenneco in 1974.

The administrative history of this case begins on December 5, 1974, when West Coast filed a complaint against Tenneco at the FEA's national compliance office. In a letter dated January 7, 1975, Thomas Bianconi, the FEA's national director of compliance, informed West Coast that Tenneco had properly calculated its prices for the Fee C oil. Six months after the Bianconi letter, however, and after further efforts by West Coast to obtain FEA action against Tenneco, the FEA issued a Notice of Probable Violation (NOPV) against Tenneco. In the NOPV, the FEA took the position that the 1972 processing agreement between Tenneco and West Coast and the use by Tenneco of its own oil on its property constituted a sale for purpose of the "produced and sold" standard in the price control regulations. Following oral and written submissions by Tenneco to the FEA, the FEA issued a Remedial Order to Tenneco on June 8, 1976. In the Remedial Order, the FEA concluded, *inter alia,* that Tenneco had miscalculated its BPCL and had overcharged West Coast for deliveries of old oil between September 1973 and November 1974. The order required Tenneco to refund the overcharges with interest to West Coast. On July 19, 1976, Tenneco filed an appeal of the Remedial Order with the FEA's Office of Exceptions and Appeals (OEA). On December 21, 1976, the OEA denied Tenneco's appeal.[8]

Seeking judicial review of the December 21, 1976 Appeal Decision, Tenneco filed a complaint against the FEA in the United States District Court for the Southern District of Texas on February 1, 1977. The parties filed cross-motions for summary judgment, and on April 11, 1979, the district court entered summary judgment for Tenneco.

## II. THE ISSUES

A precise statement of the issues is essential to the resolution of this case. In defining the issues, we look first to the administrative orders which are the basis of the

8. The OEA granted Tenneco's appeal as to that part of the order which applied to properties other than the Fee C, since these other properties had not been included in the NOPV.

FEA's action against Tenneco. The Remedial Order issued by the FEA in June 1976 stated the "fundamental questions" to be "whether the processing of crude oil into fuel oil and the consumption of crude oil as fuel on a property are 'sales' of crude oil." Processing and consumption are sales, the FEA concluded, because "these activities confer value upon a party. . . ."

The FEA reiterated this theory of the case in its appeal decision of December 1976, in which it stated:

A producer such as Tenneco receives value when its crude oil is exchanged for the payment of money, other crude oil, refined petroleum products, or services. Consequently, even though a transfer did not occur in title to the Fee C crude oil which was processed in 1972 and returned to Tenneco to be burned on the property, it is clear that Tenneco received sufficient "value" within the meaning of the phrase "produced and sold" for the quantity of crude oil involved to properly be included in the BPCL. It is undisputed that Tenneco burned the crude oil on the site as a fuel for the thermal stimulation process and that this process was an essential element of its crude oil extraction operation. Moreover, Tenneco would have accounted for the value involved as an operating expense if the firm had purchased the residual fuel oil from a third party for the identical purpose.

Clearly, the FEA has grounded its position on the hypothesis that, for purposes of the price control regulations, the requirement of a "sale" is met whenever a person derives value from property. Under this view of the regulations, Tenneco derived value from its Fee C oil and thereby "sold" Fee C oil either when West Coast processed and returned the oil in a more useful form, or when Tenneco used the oil to fuel the steam generators located on Tenneco's oil producing properties. That the mere use of oil may be a sale under the FEA's view is

confirmed by the FEA's Notice of Appeal, which describes the issue in this case as:

Whether the agency's interpretation, that volumes of crude oil produced from a property and burned on the lease as fuel for production purposes in steam generators are considered to be "produced and sold" and, therefore, included in the calculation of that property's BPCL, is correct as a matter of law.[9]

It must be emphasized that the FEA does not argue that the processing agreement between Tenneco and West Coast ever worked a transfer of title, in form or substance, as to the oil that was processed and returned to Tenneco. To the contrary, the FEA makes the bold assertion that a sale may occur without a transfer of title. Nor does the FEA contend that West Coast must be viewed as having owned the Fee C oil even momentarily. The sale was complete, according to the FEA, when the oil was processed for Tenneco, or when Tenneco used the oil for its own benefit.

In reviewing the orders of an administrative agency, a court can only affirm or reverse the agency's decision based on the agency's stated grounds for the decision. A reviewing court is not free to salvage a poorly reasoned administrative decision by substituting its own view of the facts for that of the agency. *Gulf States Utilities Co. v. Federal Power Commission,* 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635, *rehearing denied* 412 U.S. 944, 93 S.Ct. 2767, 37 L.Ed.2d 405 (1973). Counsel for the FEA have drawn special attention to the fact that Tenneco used Fee C oil on many leases other than the Fee C, but the FEA appears to have attached no significance to this fact in its administrative orders. Appellate counsel are no more authorized than this court to rewrite the basis of the FEA's orders. *Federal Power Commission v. Texaco, Inc.,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). Moreover, any attempt

---

**9.** *See also* the announcement of the FEA in the Federal Register of February 3, 1976 (subsequent to the FEA's initiation of proceedings in this case) that "[c]rude oil that is produced from and subsequently consumed on a lease"

and "refined product returned to the lease for consumption or resale" are considered to be "produced and sold" and must be included in the BPCL. 41 Fed.Reg. 4934 (1976).

to distinguish this case by pointing to Tenneco's off-site use of Fee C oil would be inconsistent with the effect of the FEA orders. The FEA demands that oil consumed by Tenneco be included in the Fee C BPCL whether consumed on the Fee C or elsewhere.[10]

Thus, the narrow issue presented to this court is whether the use or processing of oil is a sale of that oil for purposes of the price control regulations.

### III. IS OIL SOLD WHEN PROCESSED OR USED?

The thrust of Tenneco's position is that the FEA application of the price control regulations in this case is contrary to the plain meaning and industry understanding of the terms employed by the regulations. In searching for the true meaning of these regulations, we are reminded that ordinarily an agency's interpretation of its own regulations is entitled to great deference. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, *rehearing denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965). The reviewing court is not, however, bound by the agency's interpretation; an interpretation which is plainly erroneous or inconsistent with the regulations must be overturned. *Id.* Regulations must be reasonably comprehensible to those obligated to follow them, and agency interpretations which render the regulatory language meaningless or unpredictable in meaning should not be condoned.

The FEA has proceeded on the theory that a sale occurs under the regulations whenever the producer receives value for his production, and that a transfer of title in the oil in return for valuable consideration is not an essential element of the sale transaction. While it is indisputable that

Tenneco received value, we cannot agree that a receipt of value alone constitutes a sale. The first principle of regulatory construction is that regulatory terms must be interpreted according to their commonly understood definitions in the absence of a specific regulatory definition. *Burns v. Alcala,* 420 U.S. 575, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975); *Addison v. Holly Hill Fruit Products,* 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed.2d 1488 (1944). The commonly understood meaning of a "sale" is *a transfer of title* in return for valuable consideration. *Commissioner of Internal Revenue v. Brown,* 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965). The FEA cites no cases that are to the contrary. To hold that a "sale" may occur simply in the receipt of value from property would be to rob from the term any legal or economic significance. *See Mobil Oil Corp. v. Federal Power Commission,* 149 U.S.App.D.C. 310, 316–17, 463 F.2d 256, 262–63 (D.C.Cir.), *cert. denied,* 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972).

Certainly, where a transaction is in substance and economic effect a sale, a court is not bound to follow the labels chosen by the contracting parties. *Mobil Oil Corp., supra.* Moreover, a sale may occur if oil is refined under a processing agreement if title to the oil vests temporarily in the refiner. *See Saulsbury Oil Co. v. Phillips Petroleum Co.,* 142 F.2d 27 (10th Cir.), *cert. denied,* 323 U.S. 727, 65 S.Ct. 62, 89 L.Ed. 584 (1944). The FEA, however, does not allege that the processing agreement is the economic equivalent of a sale, or that ownership, in substance, has ever changed hands.

The customs and usages of the oil and gas industry do not accord a broader meaning to the term "sale."[11] The FEA cites its

**10.** The use of oil from one lease to fuel generators on many leases is not an evasion of the price control regulations. During the time Tenneco used the Fee C primarily to supply its own needs on many leases, the price control regulations did not yet exist. Even if Tenneco could be credited with having foreseen the two-tier pricing system, its use of Fee C oil on other leases was of no advantage. Assuming that off-site consumption is the critical event in this

case, the reduction in the Fee C BPCL would likely have been offset by the increased BPCL of oil producing operations in which on-site consumption of oil was obviated by the availability of Fee C oil.

**11.** Both the FEA and Tenneco rely on the law of royalties as evidence of industry understanding of the meaning of the term "sold." A lessor typically receives royalties only on oil

own Interpretation 1977–12 issued May 28, 1977 in which the agency confirmed the use by the Phillips Petroleum Company of BPCL calculations which were in agreement with the FEA's position in this case. This evidence of industry understanding was not presented until the FEA's reply brief to this court, but it should suffice to note that Interpretation 1977–12 shows at best only the conduct of Phillips many months after the FEA issued its Notice of Probable Violation against Tenneco and established its intention to proceed under the agency's new theory.

More significant is the fact that Tenneco itself first included all of the oil processed by West Coast in the BPCL for the Fee C. In September 1973, Tenneco billed West Coast for 100 percent of the oil delivered under the processing agreement and attempted to collect from West Coast an amount for new oil based on a comparison of *deliveries* of oil for that month in 1972 and 1973. West Coast objected and noted that no sale was involved as to those amounts of oil which were returned to Tenneco under the processing agreement. Tenneco conceded that West Coast was correct and recomputed the BPCL according to the amounts of oil actually sold. Whatever the reason for Tenneco's original accounting error, later corrected, we do not believe that this isolated example is sufficient to alter the well-established meaning which law and custom have attributed to the words employed by the regulations.

The FEA protests that to allow Tenneco to exclude oil consumed on-site from the BPCL would be to negate the intended effect of the regulations. Regulatory history and intent are always relevant in interpreting ambiguous language, and a literal interpretation may be avoided where necessary to effectuate the regulatory purpose. *Commissioner of Internal Revenue v. Brown, supra.* However, the language of the regulations must reasonably bear the intended meaning. A court cannot put its imprimatur on a regulation that was intended but never enacted. *Diamond Roofing v. Occupational Safety and Health Review Commission,* 528 F.2d 645 (5th Cir. 1976). If Tenneco's "plain meaning" interpretation of the price control regulations is incorrect, Tenneco may be exposed to civil or criminal penalties for its alleged overcharges. 10 C.F.R. § 205.202. As this court stated in *Longview Refining Co. v. Shore,* 554 F.2d 1006, 1014 n. 20 (Em.App.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977), "[f]undamental fairness requires that the regulations be clear so that men of common intelligence need not guess at the meaning and differ as to the application. . . . One can have knowledge of a legal duty imposed by regulations only when there is adequate notice."

Assuming for the sake of argument that the oil price regulations could be stretched to accommodate the FEA's position, we should be hesitant to stray from a plain meaning interpretation when the history and intended meaning of the regulations are so uncertain. The interpretations offered by both the FEA and Tenneco are equally tenable in light of the original regulatory goals.

When the FEA's predecessor agency, the Cost of Living Council (COLC), first proposed the two-tier pricing system for domestic oil, the amount of old oil was to be calculated by comparing the amount of oil

sold from the lease. Oil burned on-site for production purposes is not included in royalty calculations. Tenneco cites 3 H. Williams, Oil and Gas Law § 644.5 at 571, n. 3 (1977) as authority for the argument that the oil industry customarily interprets the word "sold" in royalty clauses as not including oil consumed on-site. In fact, Williams only suggests that such an interpretation "may be argued," and fails to offer any further authority for the position. The problem of interpreting "sold" in a royalty clause seldom if ever arises, since the royalty clause customarily explicitly grants or denies the right of the producer to consume oil on-site. *Id.* § 644.5.

The FEA also cites Williams in arguing that royalties are customarily due on oil used on other leases, and that Tenneco would have been liable for royalties on oil consumed on leases other than the Fee C. Again, the liability of the producer is really a matter of explicit royalty clause language governing the on-site use of oil, and has nothing to do with an industry understanding of the term "sold." *Id.*

"produced" from that property in the corresponding month of 1972.[12] Hence, the BPCL was determined by the amount of total production without regard to the amount of oil actually sold. The final regulations adopted by the Council in August 1973 contained a revised definition of new oil which was based on the increase in the amount of oil "produced and sold." [13] The FEA theorizes that the only purpose of the addition of the words "and sold" is to fix the month of measurement of a property's BPCL. In support of this theory, the FEA cites an interpretation adopted by the COLC shortly after the promulgation of the regulations. Phase IV Questions and Answers No. 15, reads as follows:

Q. Is "base production control level" for domestic crude petroleum under Section 150.354, measured by the amount produced or the amount sold? A producer sells his crude petroleum only when the field tanks are full, and often a tank sold in one month will contain quantities of crude petroleum produced in a prior month.

A. "Base production control level" is measured by both production and sales. The base production control level for a property is the amount of crude petroleum which was produced and sold in the same month of 1972. If crude petroleum was produced in one month, but sold in another, that amount is considered "produced and sold" in the month of sale for purposes of determining the base production control level.

This statement of regulatory intent, unfortunately, provides no explanation of the intended result where oil is never sold but is consumed in the production process. Question and Answer No. 15 presumes a case in which the oil is actually sold. To infer from this COLC statement that the FEA need only ask *when* oil is to be included in the BPCL is, as counsel for Tenneco notes, reminiscent of the question "When did you stop beating your wife?"

While the meaning of the phrase "produced and sold" was not further addressed by the COLC, the COLC price regulations did contain a definition of "sale" which was made applicable to the petroleum price control rules. A "sale" was defined to mean "an exchange, transfer, or other disposition in return for valuable consideration." 38 Fed.Reg. 21600 (1973). Even more revealing is a Memorandum of November 12, 1973, from George V. Biondi to David G. Wilson, COLC Assistant General Counsel, suggesting changes in the regulations in order to implement an exemption from price controls for stripper wells. The Memorandum proposed a definition of stripper well based on production, *and not on production and sales,* "since that is the real test of stripper well status, and will minimize the risk of a producer only selling ten barrels a month in order to meet the exemption." Thus the drafters of the COLC regulations evidently understood that oil produced but never sold might not be computed under a "produced and sold" test.

Tenneco offers as a rationale for the "produced and sold" standard that the purpose of the two-tier pricing system was to stimulate *net* production. The on-site use of oil for production purposes is fairly common, and a plain meaning interpretation of "sold" will have the salutory effect of coaxing producers to find the least wasteful means of production.

The FEA's insistence that only its interpretation of the regulations can satisfy the regulatory objectives, and that a plain meaning interpretation will allow circumvention of the intended rules is unpersuasive. The inclusion of oil consumed in the production process in the BPCL would reduce any incentive of the producer to increase net production by finding more efficient means of oil recovery. We are mindful that in this instance Tenneco has obtained new oil prices without any increase in actual net production from the Fee C, but the regulations as written cannot be twisted here without imposing comparable ineq-

**12.** 38 Fed.Reg. 19482 (1973).

**13.** 38 Fed.Reg. 22536 (1973).

uities on producers who achieve greater net production by the invention of more fuel efficient oil production processes. If a better rule is required, the FEA is well equipped to make the necessary changes through its rulemaking powers.

The FEA's application of section 212.72 to the facts in this case is "plainly inconsistent with the language of the regulations." *Immigration and Naturalization Service v. Stanisic,* 395 U.S. 62, 89 S.Ct. 1519, 23 L.Ed.2d 101, *rehearing denied,* 395 U.S. 987, 89 S.Ct. 2125, 23 L.Ed.2d 775 (1969). The judgment of the district court is

AFFIRMED.