**UPG, INC., Plaintiff-Appellant,**

v.

**James EDWARDS,\* Secretary of the Department of Energy, and Lynn R. Coleman, General Counsel of the Department of Energy, Defendants-Appellees,**

**Rodgers Hydrocarbon Corporation, Amicus Curiae.**

**No. 10–27.**

Temporary Emergency Court of Appeals.

Argued Feb. 2, 1981.

Decided April 8, 1981.

Richard G. Morgan, O'Connor & Hannan, Washington, D. C., with whom Terence P. Boyle and Martha Priddy Patterson, Washington, D. C. (Dean Wallace, Frank J. Duffy and Michael P. Moran, Omaha, Neb., of counsel), were on brief, for plaintiff-appellant.

Don W. Crockett, Dept. of Energy, Washington, D. C., with whom Courtney M. Price, and Alice Daniel, Asst. Atty. Gen., Civ. Div., Dept. of Justice, Washington, D. C., were on brief, for defendants-appellees.

Before CHRISTENSEN, INGRAHAM and BECKER, Judges.

CHRISTENSEN, Judge.

Presented to us on this appeal is the question of whether certain hydrocarbons occurring in natural gas pipelines, which the parties refer to respectively as "pipeline residue" and "condensate," should be treated for pricing purposes [1] as "crude oil" defined by 10 C.F.R. § 212.31.[2] In the

---

\* Pursuant to Fed.R.App.P. 43(c), the title of this appeal has been changed to reflect the substitution of James Edwards for his predecessor, Charles Duncan.

**1.** *See* 10 C.F.R. Part 212.

**2.** "Crude oil" means a mixture of hydrocarbons that existed in liquid phase in underground reservoirs and remains liquid at atmospheric pressure after passing through surface separating facilities. "Crude oil" includes condensate recovered in associated or non-associated production by mechanical sep-

context of facts submitted to the Federal Energy Administration (predecessor of the Department of Energy) [3] by plaintiff-appellant UPG, Inc., with a request for an interpretation pursuant to 10 C.F.R. Part 205,[4] the Office of General Counsel of the agency determined that they should be so treated.[5] The district court sustained that interpretation by summary judgment on the basis of an unpublished memorandum decision. UPG challenges the agency's interpretation on this appeal.[6]

The district court considered the facts reflected in UPG's request with supplementing submissions, pertinent regulations, the bases of the Interpretation, the contentions of the parties and the applicable standard of review. It concluded that the agency had demonstrated "a thorough consideration of the issues, consistent with other interpretations and other relevant factors." Addressing UPG's assertion that controlling effect should have been given to the phrase "production by mechanical separators," the court expressed the view that irrespective of the standard applied the interpretation would not be invalid when considered in light of the intent reflected in the preamble:

This preamble demonstrates that the crude oil definition reflects a historical and functional basis between condensate and natural gas liquids and was not based upon a narrow, technical meaning known only to those in the natural gas business. The Interpretations are not clearly erroneous and should be deferred to by this court in light of the Department of Energy's greater expertise in this area.

Since the interpretation was "based solely on the facts UPG presented to DOE," it was further concluded that there was "no material fact question" and that summary judgment was an appropriate means of disposing of the case.

On this appeal UPG makes three principal contentions:

I. That DOE's interpretation is inconsistent with the plain language of the regulation;

II. That the interpretation constitutes an unwarranted expansion of its "crude oil" definition; and

---

arators, whether located on the lease, at central field facilities, or at the inlet side of a gas processing plant.

Prior to September 4, 1975, the definition of "crude oil" in the Mandatory Petroleum Price Regulations read as follows:

"Crude oil" means a mixture of hydrocarbons that existed in liquid phase in underground reservoirs and remains liquid at atmospheric pressure after passing through surface separating facilities, and lease condensate, which is a natural gas liquid recovered in associated production by lease separators.

This definition was adopted on January 16, 1975 (40 Fed. Reg. 2795), and became effective as of January 10, 1975.

Prior to January 16, 1975, the definition of "crude oil" in the Mandatory Petroleum Price Regulations read as follows: " 'Crude oil' means domestic and imported crude petroleum." This definition originated on April 5, 1974 (39 Fed. Reg. 12353), and became effective as of April 3, 1974.

Prior to April 5, 1974, the Mandatory Petroleum Price Regulations and the CLC Phase IV regulations contained no explicit definition of "crude oil."

**3.** For convenience we hereafter refer to the Department of Energy (DOE) as the agency the interpretation of which is in question.

**4.** 10 C.F.R. Part 205, Subpart F, "Interpretations," §§ 205.80–205.86.

**5.** Interpretation 1978–35 dated June 9, 1978, as modified in only technical aspects by Interpretation 1978–35M, dated November 13, 1978, upon UPG's application for rehearing, 43 Fed. Reg. 29539, 43 Fed. Reg. 57589, Energy Mg't (CCH) Enforcement Manual ¶ 56,426 (Nov. 13, 1978). We shall refer to both as a single Interpretation in question.

**6.** Rodgers Hydrocarbon Corporation as amicus curiae took no definite position in its brief with respect to the merits of UPG's appeal. It implies, however, that it will do so by an independent action for declaratory and injunctive relief "to establish the proper treatment of its particular type of pipeline drip" and indicates that its position will be that the ruling in question is "in complete contradiction to widespread industry practice in the pricing of various types of what can only generally be described as pipeline drip," which "has historically been treated as a waste product unlike crude oil or refined petroleum products."

III. That the district court erred by reviewing the interpretation on the basis of a standard that applies peculiarly to the construction of statutory language.

DOE describes our problem as "the simple issue of whether the [DOE] ... has properly construed the meaning of the term 'crude oil' to include all 'condensate' recovered from the natural gas pipelines between the wellhead and the inlet meter of the gas plant." [7]

Significant facts included in UPG's submission to the Office of General Counsel are these:

UPG is a full product line company marketing LP gases ... crude oil, condensate, natural gas pipeline residue and other petroleum products.

The liquid hydrocarbon residue product ("residue" or "residue product") which UPG purchases and resells is collected by the company from "drips" and "ball run tanks" that have been installed as an integral part of a natural gas pipeline. Such residue forms in a natural gas pipeline by a cooling process which occurs as a result of the difference in temperature between the natural gas and the pipeline facility. That is, the greater the temperature differential, the more residue will form in the natural gas pipeline. This residue may be removed from a pipeline system in either of two ways: (a) by utilizing the gas pressure in the pipeline to force the residue which has accumulated at various low points, or drips, into a pressurized receiving tank truck, or (2) by running a device (known as a "pig" or "ball") through the pipeline in order to force the accumulated residue ahead of such device into a stationary receiving tank.

As the residue moves through a natural gas pipeline, it absorbs impurities and

foreign material clinging to the inside walls of the pipe. Such material generally includes iron and hydrogen sulphide, rust, oil from compressor engines, ethanol amines, caustic solutions from sulphur removal processes, acid from carbon dioxide, salt water and glycols from dehydration facilities, all of which gives the residue a dark color. After collection from drips or ball run tanks, the residue is then trucked by UPG to storage tanks where the salt water, glycols and certain of the other impurities are permitted to separate from the usable hydrocarbon residue product.

UPG's residue collection operation covers numerous natural gas pipeline drips and ball run tanks located in the States of Colorado, Kansas, Oklahoma, Texas and New Mexico. The residue product collected by "drip haulers" such as UPG was, in the past, generally discarded by simply blowing it out onto the ground, permitting it to evaporate in pits, or trucking it to disposal wells. However, during recent years, due to the increased value of this residue product and certain environmental considerations, such residue has been saved and marketed.

In its submission UPG argued that condensate as the definition of crude oil indicates, is typically recovered from a natural gas stream by the use of conventional mechanical separators (a surface separator located at the wellhead, a field separator located centrally for two or more wells, or an inlet separator or scrubber located at the inlet side of a gas processing plant).

It was contended that the process whereby condensate is recovered from a natural gas stream is markedly different from the occurrence of residue in a natural gas pipeline.

---

7. While the rationale underlying this broad position supports the interpretation in the context of the present case, we limit our decision to the validity of this interpretation on the facts stated in UPG's submission and will not assume here to evaluate other possible circumstances not before us. *See Atlantic Richfield Co. v. Fed. Energy Admin.*, 556 F.2d 542 (Em.App. 1977); *Energy Reserves Group, Inc. v. Depart-*

*ment of Energy*, 589 F.2d 1082, 1111 (Em.App. 1978) (Zirpoli, J., dissenting). *Cf. Energy Consumers, Etc. v. Dept. of Energy*, 632 F.2d 129 (Em.App.), cert. denied, —— U.S. ——, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980), involving "Subpart K," not "Subpart F" interpretation as here. The differentiation is significant as to basis and effect, but not as to standards for judicial review.

Condensate is removed from the natural gas stream prior to the sale thereof, and, for all practical purposes, the natural gas stream which passes the metering facility is in a gaseous state and does not contain free liquids.... Furthermore, the residue product was incapable of being recovered from the natural gas stream by the exclusive use of a mechanical separation device.

Following the submission of UPG's inquiry, the agency requested and was furnished copies of the contracts the company had entered into with pipeline operators for acquisition of the hydrocarbon residue. These contracts as more particularly hereinafter noted treated what UPG now terms "pipeline residue" as condensate. The agency also sought comments from various pipeline operators concerning their views on the problem of classification.[8]

None of the agency's regulations contains a definition of the terms "residue," "mechanical separator" or "condensate," nor does the Emergency Petroleum Allocation Act, 15 U.S.C. §§ 751 et seq. (1973) ("EPAA").

On September 27, 1979, DOE issued a Notice of Probable Violation to Northern Natural Gas Company, of which UPG is a wholly-owned subsidiary, claiming overcharges of more than $3,000,000 based upon the interpretation in question.[9]

It is conceded by both parties that a substantial overlap exists in the chemical compositions of condensate, natural gas liquids and natural gasoline.[10] These are among the considerations that are important as we proceed more particularly to examine in the pipeline context the agency's definition of crude oil which is based not on chemical composition but upon method of production.

## I

UPG's first major contention on appeal is that "DOE's interpretations that pipeline residue is 'crude oil' are inconsistent with the plain language of the regulations." It could have been more consistently and meaningfully phrased if the appellant had substituted the word "condensate" for the term "pipeline residue." The term "pipeline residue" apparently was coined by UPG after its submission of the request for the interpretation to put distance between its developing contention and the word "condensate." However, at the time of its request UPG equated in the context of its inquiry "condensate" with "crude oil" for pricing purposes, and sought to learn whether its "residue product" could be clas-

---

**8.** Several of these had contracted with UPG for the removal of condensate, and at least one was the parent company of UPG. Of the four respondents, three opined that the "residue" was more akin by reason of chemical composition to natural gas liquids than to crude oil. Of these, one thought that it better fitted the description of natural gasoline as defined in 10 C.F.R. § 212.31 than it did that of condensate or crude oil, and one similarly answered, but stated that UPG purchased such residue "at lower tier prices." One conceded that if the "residue" was "condensate" it would be subject to crude oil pricing, but expressed the opinion that it was neither condensate nor natural gas liquid and that therefore it was not subject to controls under the EPAA at all. And one, Cities Service Company, which we shall later see contracted with UPG for the sale of "condensate," avoided that term in its reply. It said that the composition of residue was difficult to type but that "it is more similar to natural gas liquids than to crude oil and most similar to natural gasoline" but that "[w]ith respect to

UPG's Request for Interpretation, Cities Service Company takes no position."

**9.** It should be noted that *Northern* was one of the agency's correspondents which believed that "natural gas liquids" were involved rather than "condensate"; it was also one of the parties to a contract hereinafter referred to which had thereby characterized the "residue" as "condensate." The propriety of the Notice of Probable Violation issued to *Northern* is not before us and we express no opinion concerning it.

**10.** RA at 534. "Natural gas liquids" are defined in 10 C.F.R. § 212.31 as "a mixed hydrocarbon stream containing, in whole or in substantial part, mixtures of ethane, butane (isobutane and normal butane), propane or natural gasoline" and "natural gasoline" as "all liquid hydrocarbon mixtures, containing substantial quantities of pentanes and heavier hydrocarbons, that have been extracted from natural gas."

sified as something other than condensate and, if so, what.[11]

Be this as it may, even the face of the regulation when considered with its preamble raises substantial questions concerning UPG's present position. DOE makes no contention that the so-called residue meets the criteria of the first sentence of the definition of crude oil. Nor does UPG deny that the second sentence expands the reach of the definition to "condensate" in natural gas pipelines if the "mechanical separator" criterion of the second sentence is met. UPG's entire case depends upon a narrow construction of the latter term. It cites in its brief what it calls industry definitions to buttress its position.[12]

Even such definitions could be deemed to broadly accommodate DOE's concept that the pipeline, with its effect upon pressures and temperatures, together with the associated devices specially planned for recovery and removal of the condensate, comprise a machine for separating with the aid of water or air, materials of different specific gravity, or an apparatus for separating the oil mechanically carried over by the vapor in distillation (*Tver & Berry*), or a separator which segregates oil, gas, and water with the aid, only at times, of chemical treatment and the application of heat (*Langenkamp*). The general acceptation of the terms is more broadly hospitable to the agency's interpretation.[13] There are other considerations suggested on the face of the definition which could be noted were we to be governed entirely by technicalities.

The first sentence of the regulatory definition of crude oil places the second sentence, directly applicable here, in the context of "condensate" and "separating facilities." Looking at the second sentence alone, there is no provision that its indispensable definitional element is the employment of mechanical separators;[14] only that crude oil "includes condensate recovered ... by mechanical separators" and that the

11. Pursuant to 10 C.F.R. Part 205, Subpart F, UPG, Inc. ("UPG") on its own behalf, hereby requests an interpretation concerning the applicability of certain portions of the price regulations, 10 C.F.R. Part 212, to a segment of its operations.

*ISSUES PRESENTED*

1. Whether a liquid hydrocarbon residue product which occurs exclusively in a natural gas pipeline is to be treated as "condensate" by UPG for purposes of the applicable price regulations, 10 C.F.R. Part 212.

2. Whether such residue product, if not treated as "condensate" by UPG, nor considered by FEA to be "condensate," is a "covered product" other than "crude oil" for purposes of the applicable price regulations, 10 C.F.R. Part 212.

3. Whether such residue product, if treated by FEA as a "covered product" other than "crude oil" is to be resold by UPG in accordance with the applicable price regulations, Subpart F of 10 C.F.R. Part 212.

12. Separator: (1) Machine for separating, with the aid of water or air, materials of different specific gravity. (2) An apparatus for separating the oil mechanically carried over by the vapor in distillation. (3) A closed steel vessel or tank of special design having interior baffles and automatic regulating valves used to separate gas in large volumes from oil as they flow from a well.
Tver & Berry, *The Petroleum Dictionary* 307 (1980).

Separator: A pressure vessel (either horizontal or vertical) used for the purpose of separating well fluids into gaseous and liquid components. Separators segregate oil, gas, and water with the aid, at times, of chemical treatment and the application of heat.
Langenkamp, *The Illustrated Petroleum Reference Dictionary* 146 (1980).

13. MECHANICAL ... 1. having to do with machinery ... 13. pertaining to or controlled or effected by physical forces....
SEPARATOR ... 1. one who or that which separates. 2. any of various apparatus for separating one thing from another.
The Random House Dictionary of the English Language (1966).

14. It is true that the Office of General Counsel accepted the theory that to constitute crude oil the condensate had to be recovered "by mechanical separators" but this acceptance was expressly related to the concept that the process of separation by pipeline forces and extraction through drip and ball run tanks was reasonably within the contemplation of the term. Similarly, UPG overstates the position of the district court as being that a mechanical separator is not used by it; what the district court did say was that "[the residue] is not separated or removed from the gas stream by means of a mechanical separator *per se* (*i. e.*, a heater separator or a heater treater)."

point of recovery along the pipeline, "whether located on the lease, or central field facilities, or at the inlet side of a gas processing plant," is immaterial to the definition.[15]

In considering the question of plain meaning, the preamble to the regulation in question must not be disregarded. After reviewing the historical treatment of condensate the agency there concluded:

[C]ondensate, . . . whether recovered from conventional surface separators, central field facilities, or at the inlet side of a gas processing plant, traditionally and historically has been gathered, priced, and refined as crude oil, and is therefore properly treated as crude oil under Subpart D of the price regulations.

The latter statement and the "mechanical separator" frame of reference included in the definition may better be understood in light of the fact that until recent years condensate from natural gas pipelines, except for that recovered by the use of special mechanical separators, was considered and handled as waste having no economic value.[16] The 1975 definition included as typical of the historic method of recovery having economic significance "mechanical separation."

In view of the circumstances already referred to it would, indeed, be a tyranny of words rather than a recognition of ideas portrayed by words to narrowly construe the definition of crude oil in the manner UPG's argument on "plain meaning" would have us do.

For the reasons stated we reject appellant's contention that the agency's interpretation is inconsistent with the plain language of the regulation defining crude oil.

## II

If we assume that between UPG's narrow reading of the definition and the agency's broader interpretation, a real ambiguity is presented on the face of the regulation in its developmental setting, further consideration of the interpretation in the light of additional circumstances is convincing that the Office of General Counsel did not erroneously expand, rather than validly interpret, the regulation in question.

As we have already noted, one of the correspondents of the agency has asserted in support of the rationale of UPG, and the amicus curiae has suggested, that hydrocarbon residue, even though condensate and thus regulated had it been removed by "mechanical separation," escapes the reach of the EPAA entirely when recovered as "pipeline residue" through the use of drip tanks, ball run tanks, dehydrating units and the pipeline itself.

Even were this condensate subjected to price regulation, its classification as natural gas liquids or natural gasoline thus would not only involve the superficial distinctions of terms already discussed, but would invite additional regulatory problems that the present interpretation avoids. Under DOE's interpretation, all condensate collect-

---

15. It hardly seems reasonable even on the face of the regulation in view of this broad provision to suppose that the location or omission of "mechanical separators," wholly at the election of the pipeline owner, could mark the difference between condensate being considered crude oil or something else. This problem was explored by the trial court and UPG's theory further elucidated:

The Court: But this thing says with respect to the " * * * mechanical separators, whether located on the lease, at central field facilities, or at the inlet side of the gas processing plant."

[Counsel:] Okay, if we had one down here further down the pipeline, put in a mechanical separator and it was taking out liquids there we would agree that is crude oil, like-

wise if you've got one at the inlet side of the gas processing plant and you're running it through a mechanical separator there, we don't have any quarrel with that, that is crude oil.

16. The residue product collected by "drip haulers" such as UPG was, in the past, generally discarded by simply blowing it out into the ground, permitting it to evaporate in pits, or trucking it to disposal wells. However, during recent years, due to the increased value of this residue product and certain environmental considerations, such residue has been saved and marketed.
UPG's Request for Interpretation dated April 21, 1977.

ed and removed from natural gas pipelines would be controlled by the crude oil regulations (Subpart D). Liquid hydrocarbons produced between the inlet and outlet meters of gas plants would be controlled by the natural gas liquids regulations (Subpart K).[17] The regulatory dividing line between the two products thus would be clear and not susceptible of misinterpretation or evasion. Under UPG's interpretation, its comparable condensate would be collected and sold in a manner dissimilar to the handling of other condensate, but treated as a natural gas liquid for pricing purposes. If a "mechanical separator" within its definition were used, UPG would term the same general type of condensate "crude oil" for pricing purposes. As pointed out by DOE, adoption of the latter view would not only provide UPG with the direct pricing advantage of a natural gas liquid, but might also entitle UPG to additional pricing benefits enjoyed by that classification only because it has been considered by the agency to involve production within the confines of gas processing plants.[18] On the other hand UPG sees insurmountable administrative problems in reconciling DOE's concept of "property" production with treatment of its "pipeline residue" as crude oil. Its concession that no matter where condensate was produced by "mechanical separation" or how many producers might be involved in the gas supply, it has been and should be treated as crude oil, places this argument in perspective—a problem of agency administration of the existing concept of condensate as crude oil.

UPG contends that the agency's problem, and thus ours, is simply a matter of law with respect to which administrative expertise is entitled to little if any deference. But the legal aspects of problems such as this, solutions for which depend importantly upon regulatory, economic, industrial and administrative relationships and other practical considerations, are not entirely unresponsive to the administrative expertise.

UPG would have us deny deference to the interpretation also because there is no showing of its being followed consistently over a long period of time. But the agency has not been inconsistent.[19] The principle of a broad, practical construction on the basis of "condensate" under related situations theretofore had been applied.[20] It is

17. We do not have before us the problem of relating natural gas liquids pricing to production between the inlet and outlet meters of gas plants, and do not base our decision upon the assumption that such corollary treatment would necessarily be required. Suffice it to say that DOE's present interpretation by reason of the other circumstances and reasons indicated is fully warranted and would permit some such reconciliation in solution of a difficult administrative problem.

18. Increased costs of natural gas liquids are calculated pursuant to a shrinkage formula which measures the "opportunity cost" of the BTU's "lost within the confines of a gas processing plant." UPG argues that under DOE's regulatory scheme the shrinkage formula could also mean the "opportunity cost of BTU's lost within the confines of the pipeline; citing § 212.167.

19. THE COURT: I understand that is your position and not an unreasonable one, but you don't then I take it find any specific instances where they made an inconsistent interpretation?
[Counsel for UPG:] That's right, to the best of our knowledge.
RA at 807.

20. *See* Mobil Oil Corp., Interpretation 1977–31, 42 Fed. Reg. 46273, Energy Mg't (CCH) Enforcement Manual ¶ 56,368 (Aug. 12, 1977), in which the agency in the allocation context held that "[t]he fact that the condensate facilities span an area of twenty miles does not alter the conclusion that the basic method of recovery in this case is comparable to the domestic recovery of lease condensate." In the course of its discussion, the agency also noted that "[f]or the purposes of FEA's price regulations (10 C.F.R., Part 212, Subpart D), condensate, wherever recovered (lease, field or plant) is considered as crude oil and priced accordingly. (See 40 FR 40819, September 4, 1975). However, for the purposes of the allocation regulations (10 CFR part 211) only lease condensate is included in the definition of crude oil." *Cf. Mobil Oil Corp. v. Federal Energy Administration*, 566 F.2d 87, 92 and 102 (Em.App.1977), in which we decided as to a 1974 regulation, on the narrow issue of whether the statute comprehended liquid hydrocarbons from natural gas, "that the FEA, by its regulation of condensate as 'crude oil' under the EPAA, did not violate the intent of Congress, and that its regulation should be upheld."

understandable that the precise problem covered by the Interpretation in question had not been expressly addressed before, since the economic use of the hydrocarbon residue from pipelines was of comparatively recent origin, and up to almost the time of its request for an interpretation UPG apparently had been terming the residue it now said was not condensate, as expressly that.

We cannot agree with UPG's argument that the agency's interpretation was an undue expansion of the Crude Oil definition; that it was not foreseeable, and that the company was left to guess at the agency's intent until the interpretation was issued.

The 1974 contract between UPG and Northern Natural Gas Company, its parent corporation, contains a rather apt description with reference to "condensate" of a "pipeline separator," that broadly might be thought of as a "mechanical separator," in its preamble: "WHEREAS, in conjunction with the operation of said pipelines, Northern has constructed drips and reservoirs for the purpose of collecting the condensate which separates in liquid form from the natural gas transported through said pipelines...." UPG undertook to collect "condensates, including water" from Northern's storage points, and in return received a specified price per gallon for "all hydrocarbon condensate," and an additional charge for the water removed in connection therewith.

UPG's contract with Cities Service Gas Company dated December 1, 1975, recited, among other things:

WHEREAS, Gas Co. has installed certain pipeline drips on some but not all its well lines, lateral lines and gathering truck lines in the Bishop Field for the purpose of collecting hydrocarbon condensate, water and/or other liquids (hereinafter referred to as Liquids) which separate from the natural gas transported through said pipeline facilities....

Upon these premises UPG undertook to remove all of said "Liquids" and contracted to receive in compensation a given amount per gallon of "all hydrocarbon condensate, f. o. b.

point of collection, collected from the field drips," together with a given price per gallon "for the gathering, hauling and disposal of water only, collected from the field drips." *Cities* certified in this contract "that the prices charged for the hydrocarbon condensate sold hereunder are no greater than the maximum prices permitted pursuant to the Federal Energy Administration Regulations."

In 1977 UPG's contract with Northern Natural Gas Company operating as Peoples Natural Gas Division stated, *inter alia*:

WHEREAS Peoples owns and/or operates certain natural gas pipelines and wellhead equipment (hereinafter referred to as Peoples "System"), situated in the States of Kansas and Colorado; and

WHEREAS, in conjunction with said system, Peoples owns and/or operates certain drips, separators, scrubbers, reservoirs, and storage tanks (hereinafter referred to as "facilities") for the purpose of collecting the condensate, crude oil, water, and other liquids (hereinafter referred to as "liquids") which separate from the natural gas transported through said system....

A single price per barrel was to be paid to UPG for "all hydrocarbon condensate or crude oil," f.o.b. point of collection, collected from the foregoing described facilities.

UPG did not mention in its request for an interpretation how the condensate theretofore had been contracted for by it, although as we have seen it did then accept DOE's present position that "condensate" and "crude oil" in the context of its situation would be the same. After it was required to produce copies of these contracts for examination by the agency, however, it hastened to explain through its attorney, using for the first time as far as the record discloses the expression "pipeline residue" in contradistinction to "condensate":

By improperly referring to all of these liquid hydrocarbons as "condensate," rather than both pipeline "residue" and *condensate*, which latter product is in-

cluded in the definition of "crude oil" under Part 212.31 of the regulations, UPG, Inc., was made aware of certain problems which this general term ("condensate") created for purchasers of such liquid hydrocarbons. That is, UPG, Inc., purchases and resells "crude oil," pipeline "residue" and "condensate," and has improperly referred to the latter two products as *condensate* under its contracts for the purchase thereof.

This confession indicates why UPG made the request for an interpretation as and when it did and sketches its developing theory that "pipeline residue" was something different than the "condensate" which it assumed in its request for an interpretation would be the equivalent of "crude oil." But this was not an avoidance as well as a confession; there remained a clear indication that the interpretation equating "crude oil" with the "condensate" UPG was

handling had been reasonably foreseeable all the time.

The interpretation in view of all the circumstances appears to us to be, if not the only rational construction, a reasonable one not inconsistent with the interpreted regulation, in harmony with the objectives of the authorizing statute, consistent with other regulations and rulings of the agency, based upon the relevant factors, and persuasively articulated by its Office of General Counsel.[21]

### III

On such a record we are at loss to fully understand UPG's third contention that the district court erred by reviewing the Interpretation "under a standard that applies to the construction of statutory language." It is true that the views of the trial court are also supportable by uncited guidelines that have been applied to the interpretation of statutory language,[22] but such common

21. In view of the acceptance by UPG prior to the submission of its request for an interpretation that the residue it was handling was condensate, and its acceptance by its very statement of its inquiry that if condensate it would be priced as crude oil pursuant to the regulations, the following explanation in the Interpretation assumes additional cogency:

> The use of the term "mechanical separators" in the definition of "crude oil" was designed to distinguish production of liquids by condensation as the result of temperature reduction to ambient levels and accompanying pressure changes (condensate) from production by absorption, adsorption, or extraneous refrigeration processes (natural gas liquids or natural gasoline). The fact that no mechanical device is employed to induce condensation does not mean that the liquids at issue here should not be classified as condensate. Indeed, the pipeline itself operates to condense the liquids by an equivalent process to that employed by mechanical separators at the lease. The DOE has consistently distinguished condensate from natural gas liquids and natural gasoline by the recovery process employed, rather than the operational objectives of the firm or the design objectives of the equipment.

The interpretation adding this broader definition was buttressed

> by the fact that liquids recovered at the inlet side of a gas processing plant by mechanical separators are condensate for purposes of the pricing regulations. Similarly, liquids recovered by mechanical separators at central

field facilities are condensate for pricing purposes.... Therefore, it would be anomalous to define the liquids at issue here, which condense after passing through the field separators and before the inlet scrubbers, as natural gas liquids or natural gasoline. Logically, the liquids recovered in pipeline drips and ball tanks should be treated consistently, i. e., as condensate.

22. Construction of statutory language in conformity to a special meaning which it has in relation to the subject to which a statute pertains will nevertheless not be adopted by the courts, if they believe, all things considered, that the legislature intended the general meaning to apply in that instance, or if they consider it contrary to implications of the context, or the subject matter. The common meaning will likewise be preferred if the special meaning ascribed to the words of phrase would defeat the object of the law, or be contrary to a reasonable operation of the statute, or contrary to a definition within the statute, or contrary to a general interpretation statute, or contrary to other statutes relating to the same subject, or if the proposed construction is absurd or harsh, or if the proposed construction would involve a contradiction between different parts of the statute, or be repugnant to sound, acknowledged principles of national policy.
Sutherland, Statutory Construction, Vol. 2A, § 47.27, p. 138.

sense without imprimatur is coin of the realm for both administrators and judges. We perceive nothing in the language of the district court nor the result it reached which justifies appellant's assumption or which indicates other than a considerate application of our decisions concerning the standard of review applicable to administrative interpretations of regulatory language.[23]

There would be little occasion to add to our recent comprehensive discussion of the standards for review applicable here, *Energy Consumers and Producers Ass'n v. DOE, supra,* at 140, 142–144, were it not for the contrary emphasis appellant places upon language in previous decisions of this court in its attempt to establish that an interpretation must fail if it is not supported by plain and certain language in the regulation interpreted.

Contending that *Energy Consumers* is "completely distinguishable from this case," UPG relies upon language in *Tenneco Oil Co. v. FEA,* 613 F.2d 298 (Em.App.1979), and additionally cites *Longview Refining Co. v. Shore,* 554 F.2d 1006 (Em.App.1977); *Standard Oil Co. v. Department of Energy,* 596 F.2d 1029 (Em.App.1978); and *Kraus & Bros. v. United States,* 327 U.S. 614, 66 S.Ct. 705, 90 L.Ed. 894 (1946), in support of its contentions that to justify the interpretation of a regulation, as distinguished from a statute, the regulation must unambiguously support the interpretation, especially in view of the "draconian penalties" which now face those who fail to comply with DOE regulations.

There ordinarily is no need for an administrative interpretation of clear and unambiguous regulatory language. The law does not reject interpretations merely because there is a need for them; and the enforcement of almost all EPAA regulations as interpreted entails substantial financial consequences to oil companies, consumers, or others.

Appellant misconceives the true meaning of the cases it primarily relies on; they mainly discuss the problem of willfulness in the criminal law context. The prospect that some collateral effect of the Interpretation here may be advanced as a basis of a criminal prosecution or the application of civil sanctions where the question of certainty in meaning and wilful intent may be

---

**23.** *Standard of Review*

Courts often place great weight or deference on the interpretation given to statutes and regulations by those agencies charged with the responsibility of administering them. *University of Southern California v. Cost of Living Council,* 472 F.2d 1065 (Em.App. 1972). This is particularly appropriate where the administrative practice involves a contemporaneous construction of a statute by those charged with its administration. *Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391 (Em.App.1975); *University of Southern California v. Cost of Living Council, supra.* One of the primary reasons for this deference is the agency's greater expertise in the area which it regulates. *Standard Oil Company v. Department of Energy,* 596 F.2d 1029 (Em.App.1978); *Jicarilla Apache Tribe v. Federal Energy Regulatory Commission,* 578 F.2d 289 (10th Cir. 1978). If the interpretation is not based on expertise in a particular field, however, but is, instead, based on general common law principles, great deference is not required. *Standard Oil Company v. Department of Energy, supra.* Deference is not a hard and fast or absolute rule. The weight to be given an interpretation depends upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and other persuasive factors. *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *Standard Oil Company v. Department of Energy, supra.* The deference rule does not control if the interpretation is plainly erroneous or inconsistent with the regulations. *Standard Oil Company of Ohio v. Federal Energy Administration,* 612 F.2d 1291 (Em.App.1979).

The standard of review for agency action alleged to be arbitrary and capricious is not simply whether there exists a rational basis, but is, instead, whether the decision is based on the consideration of relevant factors, whether there is a clear error of judgment, and whether there is a rational basis for the conclusions approved by the administrative body.... It is not required that the interpretation be the only reasonable choice. *Energy Consumers and Producers' [sic] Ass'n v. DOE,* 632 F.2d 129 (Em.App.1980).
Memorandum Opinion and Order of Judge Eubanks, RA at 824–25.

at issue is not controlling. Time enough to address such issues if and when they are appropriately presented.

It is true that there is language in *Tenneco, supra,* which taken out of context lends color to UPG's contention.[24]

That decision, correct on its facts, accepting as it did the plain meaning of the word "sale," and the authorities it cites on the question of certainty in regulatory language [25] are inapposite here. Inconsistency with plain meaning, or the issues of willfulness or criminal responsibility are not involved here. *Kraus & Bros. v. United*

*States,* 327 U.S. 641, 66 S.Ct. 705, 90 L.Ed. 894 (1946), involved a criminal prosecution for the alleged violation of maximum price regulations. Equating of the present case with the situation in *Standard Oil Co. v. DOE,* 596 F.2d 1029 (Em.App.1978), *supra,* where the treatment of the regulation by the agency itself had been confusing and contradictory, is unwarranted.[26]

The Interpretation here, in view of its regulatory framework and the circumstances we have detailed, might better be deemed the rendering explicit of what was already implicit in the interpreted regulation. *See Energy Reserves Group, Inc. v.*

---

24. The FEA protests that to allow Tenneco to exclude oil consumed on-site from the BPCL would be to negate the intended effect of the regulations. Regulatory history and intent are always relevant in interpreting ambiguous language, and a literal interpretation may be avoided where necessary to effectuate the regulatory purpose. *Commissioner of Internal Revenue v. Brown, supra.* However, the language of the regulations must reasonably bear the intended meaning. A court cannot put its imprimatur on a regulation that was intended but never enacted. *Diamond Roofing v. Occupational Safety and Health Review Commission,* 528 F.2d 645 (5th Cir. 1976). If Tenneco's "plain meaning" interpretation of the price control regulations is incorrect, Tenneco may be exposed to civil or criminal penalties for its alleged overcharges. 10 C.F.R. § 205.202. As this court stated in *Longview Refining Co. v. Shore,* 554 F.2d 1006, 1014 n. 20 (Em.App.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977), "[f]undamental fairness requires that the regulations be clear so that men of common intelligence need not guess at the meaning and differ as to the application. . . . One can have knowledge of a legal duty imposed by regulations only when there is adequate notice."
613 F.2d at 303.

25. *Diamond Roofing v. Occupational S. & H. Rev. Com'n,* 528 F.2d 645 (5th Cir. 1976), involved citations of the Secretary of Labor for violations of safety regulations. *Contrast Shell Oil Company v. Federal Power Commission,* 491 F.2d 82 (5th Cir. 1974), where the same court in a more comparable case with far-reaching consequences upheld the interpretation of the Commission, declaring that while a court will accord less deference to an interpretative rule than to a legislative ·rule, an agency's interpretation of its own regulations merits

deference and that where its regulation was ambiguous and subject to two different interpretations, the court would not overrule its choice of one.

*Longview Refining Co. v. Shore,* 554 F.2d 1006 (Em.App.1977), dealt with essentials to establish a "willful overcharge" construed by this court in the criminal sense, and the statement which *Tenneco* ascribes to *Longview* was supported in *Longview,* 554 F.2d at 1014 n.20, by the citation of *Boyce Motor Lines v. United States,* 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952), a criminal case involving the validity of an indictment. Even there the Supreme Court refused to sustain the quashing of the indictment on the claim that the agency regulation was unduly vague. The Court called attention to the fact that the statute punished only those knowingly violating the regulation and observed that "[t]his requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid." 342 U.S. at 342, 72 S.Ct. at 331.

26. This court in *Standard Oil* expressly recognized the general rule that where administrative regulations are ambiguous on their face, the court should look to the construction the responsible agency has given to them, and that an agency's interpretation of its own regulation is normally deemed controlling unless it is plainly erroneous or inconsistent with the regulations. 596 F.2d at 1055–56. *See also Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). It was only by reason of the extraordinary circumstances of *Standard Oil* that an adequate basis for according deference was not found.

*Department of Energy,* 589 F.2d 1082 (Em. App.1978). But if not the only rational choice, it was a reasonable one the principle of which had been applied consistently by the agency, one fairly predictable and reasonably articulated at the time on the basis of relevant consideration, and meriting deference.

The Judgment of the district court upholding the Interpretation is AFFIRMED.