## Aeroplane Oil and Refining Company v. Disch.

(Decided June 3, 1924.)

### Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. Mines and Minerals—Seller of "Producing Well" Held Not to Covenant for Well Producing Five Barrels.—One not an oil man selling oil lease under written contract, stating that "there is now a producing well, the capacity of which is not yet kown," was not bound by covenant to show a well producing five barrels per day, though oil men do not consider a well a "producing well" unless it produces that amount.

2. Corporations—Delivery of Oil Lease to Stock Salesman Held Delivery to Corporation.—Delivery of assignments of oil leases to person selling stock for corporation was delivery to corporation, where stock salesman had been factotum of company in matter of obtaining leases from beginning.

3. Corporations—What Became of Assignments of Leases After Delivery to Corporation's Agent Immaterial.—What agent for corporation did with assignments of oil leases after they were delivered to him was immaterial as affecting liability of corporation for purchase price.

EUGENE COONEY and SHACKELFORD MILLER for appellant.

L. D. GREENE for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Affirming.

On June 2, 1919, J. F. Disch entered into a written contract with the Aeroplane Oil and Refining Company, by which, in consideration of the sum of $20,000.00, he agreed to sell and transfer to it a certain oil and gas lease in Allen county on sixty acres of land. $10,000.00 of the consideration was taken in stock of the company; $5,000.-00 was paid soon after the transfer, and the other $5,000-

00 was to be paid later. The contract contained, among other things, these words:

> "Upon the aforesaid lease of 60 acres there is now a producing well, the capacity of which is not yet known, and a temporary rigging has been pumping into a 250-barrel tank just erected on said lease."

On January 30, 1920, Disch brought this action against the Aeroplane Oil and Refining Company to recover the $5,000.00 which had not been paid him. The company filed an answer and counterclaim by which it alleged that the plaintiff falsely and fraudulently represented to it, both before the execution of the contract and in and by the terms of the contract itself, that there was at that time on the lease of sixty acres a producing well and that a temporary rigging had been pumping into a 250-barrel tank just erected on the lease, but that these representations were false and fraudulent; that there was no producing oil well on the lease; never had been any, and that there was no temporary rigging pumping oil in any tank.

The issues were made up, proof was taken and on final hearing the circuit court entered judgment in favor of the plaintiff for $5,000.00, as prayed in the petition and dismissed the counterclaim. From this judgment the defendant appeals.

The facts are these:

In May, 1919, there was a stockbroker in Louisville by the name of F. L. Harris. He wished to sell some oil stock and conceived the idea of organizing the Aeroplane Oil and Refining Company. To this end he obtained in Delaware the charter of the company, paying himself the expenses. He then induced a number of gentlemen to go in the enterprise and become directors of the company. He did not take any stock himself as he was going to sell the stock. On May 27th his associates had a meeting in his office. This was before they had formally organized the company. At this meeting Harris explained to his associates that it was necessary for them to acquire some property before putting the stock on the market. He told them about the sixty acre lease and about the producing well upon it. The company had no money with which to make the purchase. Harris then told them of a man by the name of Disch who could be got to buy the lease on these conditions; that Disch would provide the $6,000.00 needed to make the purchase and would wait until they sold the

stock to pay him. He was to get $10,000.00 in money and $10,000.00 worth of stock. His associates then told Harris to go ahead and take the proposed action and they would ratify it after he got it consummated. They left him to engineer the whole affair. On June 2nd the company formally organized and the directors met with Disch in Harris' office; Disch had his attorney present; the matter was discussed. Disch told the directors that he had never seen the property; did not know anything about it and if they were willing to take these contracts off his hands, paying the price agreed by Harris with him, that he would take them, but unless they would so agree he would not take them. An option on the property was about to expire and so the matter was closed that day before the option expired, and the stock of the company was issued and Harris began selling it. Within a week or two the president of the company and some of the directors went to Allen county and looked over the property. They found there an oil well rigged with a pump and a tank. The pump was not working. They asked the man in charge of the pump to start the pump and he said it was then broken; but they saw signs of oil on the ground around it and also around the well. They were not oil men; this was their first venture in the oil business. Thus things ran along until September, when they employed an experienced oil man to go down to Allen county and take charge of the property. He examined it carefully and reported that the well was not producing oil and was never substantially an oil producer; that in fact there was no oil there in any paying quantities and never had been. They thereupon refused to make any further payments to Disch and this litigation followed.

There is an utter failure of proof to show any fraudulent representation made by Disch. The proof is conclusive that Disch knew nothing about the property and so told the officers of the company at the time the contract was made. Harris was the only man that made the representations, and in making them plainly he was not the agent of Disch. After he had represented the matter to his associates and obtained their consent he saw Disch, whom he knew, and induced Disch to enter into the arrangement to buy the property and turn it over to the company, as above stated. Disch acted entirely upon the representations of Harris and had nothing to do with the matter until he was induced by Harris to go into it on these terms, and, before he did go into it, he had the meet-

ing with the directors on June 2nd. They all at that time fully understood the situation.

But it is earnestly insisted that though Disch made no verbal representation, he is bound by the covenant of his written contract, in which it is stated: "There is now a producing well, the capacity of which is not yet known." It is shown by the proof that oil men do not consider a well a producing well unless it produces at least five barrels a day, and that this well never produced over two barrels a day. But Disch was not an oil man; the directors of the company were not oil men; the language of their contract must be read as the language of ordinary people, for neither Disch nor the directors knew that the term "producing well" was only applied among oil men to a well that produced five barrels a day. In ordinary speech a producing well is one that produces oil, and there can be no mistaking the meaning of this contract because these words immediately follow, "the capacity of which is not yet known." When it is expressly stated in the contract that the capacity of the well is not known, it cannot be held that there was a covenant that the well produced five barrels a day. The contract on its face shows what is plainly shown by the parol testimony, that none of the parties then knew the capacity of the well and that its capacity was not guaranteed.

"Courts, in the construction of contracts, look to the language employed, the subject-mater and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and accordingly they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words, and of the correct application of the language to the thing described. It is therefore an established canon of construction that in order to arrive at the intention of the parties, the contract itself must be read in the light of the circumstances under which it was entered into. General or indefinite terms employed in the contract may be thus explained or restricted as to their meaning and application." 6 R. C. L. 849.

"But, in the construction of all contracts, the intention of the parties making the contract, if it can be arrived at from a consideration of the instrument, must control, and in aid of what the parties intended

it is admissible in the construction of many contracts, that are on their face free from ambiguity, to consider their situation and the circumstances and conditions surrounding them at the time the contract was entered into, not for the purpose of modifying or enlarging or curtailing its terms, but to shed light upon the intention of the parties. And the intention of the parties thus gathered will prevail unless it does violence to the meaning of the contract as written." L. & B. S. Ry. Co. v. Moore, 140 Ky. 517.

To the same effect see Mitchell v. Southern R. Co., 124 Ky. 146, and Owens v. Georgia Life Ins. Co., 165 Ky. 507.

Read in the light of the circumstances under which the contract was made, the words, "the capaciey of which is not known," modify the preceding words, and taken as a whole the clause is not a covenant as to the capacity of the well.

The contract was not made by Disch with knowledge of its falsity or with reckless disregard of its truth. The fact is that both Disch and the directors were misled by Harris, who was anxious to sell stock and procured the arrangement with Disch, and the contract between Disch and the company for this purpose.

It is also insisted that the judgment in favor of Disch is erroneous in this, that he had not delivered to the company the assignment of the leases referred to; but the proof is conclusive that he delivered these to Harris when Harris brought him the check from the company making the last payment paid him on the purchase money. He had telephoned to the company for his money; the company answered that it would send him a check. Soon thereafter Harris brought the check and asked for the leases and they were given to him. In view of all that had gone before and the way business of this company was carried on, the delivery of the leases to Harris when he delivered the check was a delivery to the company. He had been the factotum of the company in all this matter from the beginning to that time.

"The liability of the principal is not limited to such acts of the agent as are expressly authorized or necessarily implied from express authority. All such acts of the agent as are within the apparent scope of the authority conferred on him are also

binding upon the principal, apparent authority being that which, though not actually granted, the principal knowingly permits the agent to exercise, or which he holds him out as possessing." 21 R. C. L. 854.

While Harris was not an officer of the company he practically ran things. The officers paid little attention to matters. What he did with the papers after they were delivered to him does not appear, and that is immaterial.

It follows that the circuit court properly dismissed the counterclaim and properly gave judgment in favor of Disch for the balance due him on the contract, for Harris was not his agent in the transaction. The company simply took a chance and failed in the chance.

Judgment affirmed.