**WIGGINS BROTHERS, INC., et al.,
Plaintiffs-Appellees,**

v.

**DEPARTMENT OF ENERGY, and James
B. Edwards, Secretary of Energy,
Defendants-Appellants.**

Nos. 5–53, 5–57.

Temporary Emergency Court of Appeals.

Argued Jan. 20, 1981.

Decided Oct. 14, 1981.

As Amended Oct. 26, Nov. 2 and
Nov. 12, 1981.

Certiorari Denied March 29, 1982.
See 102 S.Ct. 1749.

John P. McKenna, Dept. of Energy, Washington, D.C., with whom Alice Daniel, Asst. Atty. Gen., Civ. Div., Dept. of Justice, Nancy C. Crisman, Frank W. Krogh and Samuel Soopper, Dept. of Energy, Washington, D.C., were on the brief, for defendants-appellants.

A. B. Conant, Jr., of Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., with whom Karen S. Bedell and Richard L. Allen, Dallas, Tex., were on the brief, for plaintiffs-appellees.

David J. Beck, Ronald D. Secrest, Fulbright & Jaworski, Houston, Tex., for Exxon Corp., amicus curiae.

Before HOFFMAN, INGRAHAM and BECKER, Judges.

WILLIAM H. BECKER, Judge.

## THE RECORD ON APPEAL

The massive record filed in this Court (with disparate typed numbers and mechanically stamped numbers, which latter are used as page references, all inclusive cited with zeros omitted) includes the following:

A. "Record on Appeal—Pleadings File" (R.) in two volumes with pages 1–336 (000001–000336) in Volume 1, and pages 337–628 (000337–000628) in Volume 2;

B. "Record on Appeal—Administrative Record" in five volumes, with pages 1–79 in Volume 3, pages 80–170 in Volume 4, pages 171–601 in Volume 5, pages 602–1051 in Volume 6, and pages 1052–1614 in Volume 7;

C. Joint Appendix (J.A.), pages 108–628; and

D. Exhibits A, B, C and D submitted in this Court November 4, 1980, under seal by Exxon Corporation, *Amicus Curiae.* These exhibits purport to be a memorandum dated September 20, 1974, and copies of depositions and deposition exhibits taken by plaintiffs in this case, in the multidistrict stripper well litigation in the District of Kansas entitled *In Re: Department of Energy Stripper Well Exemption Litigation,* M.D.L. No. 378, as follows:

1. Exhibit A, Deposition of George V. Biondi taken September 10, 1980;

2. Exhibit B, Deposition of William N. Walker taken September 11, 1980;

3. Exhibit C, Deposition of Linda Elizabeth Buck taken September 10, 1980; and

4. Exhibit D, Memorandum dated September 20, 1974, to John Vernon, Associate Assistant Administrator for Fuels Management, from Randall B. Alldrodge, through Edmund Winterbottom, Manager, Crude Oil, Refinery Yield, Petroleum Feedstocks, discussing effects of excluding and including injection wells in the well count under the stripper well litigation.

All deponents were lawyers formerly employed by one or more predecessors of the Department of Energy (DOE) before the issuance of the stripper well regulations and Ruling 1974–29. Biondi and Buck were subordinate employees. Walker was general counsel for the Cost of Living Council (CLC) until January 1974, and thereafter for the Federal Energy Office (FEO) until June 1974, when he was consultant for the Federal Energy Administration (FEA) until August 1974.

These depositions were taken over objections by DOE on grounds of "predecisional" and attorney-client privileges.

## THE JUDGMENT OF THE DISTRICT COURT

The DOE and the Secretary of Energy, defendants-appellants (appellants hereinafter), appeal from a judgment of the United States District Court for the Northern District of Texas (1) declaring that injection wells may be counted as "wells that produced crude oil" under the Marginal Property Rule, 10 C.F.R. 212.72 (as amended effective June 1, 1979), and (2) enjoining the DOE "from excluding the counting of injection wells in the application of the Marginal Property Rule to the plaintiffs' property" (J.A. 273).

The judgment, from which this appeal was taken, was entered July 23, 1980 and was accompanied by a Memorandum containing findings of fact and conclusions of law (J.A. 274–279).

The issues were heard in the District Court on cross motions for summary judgment described hereinafter. The judgment for the plaintiffs-appellees (appellees hereinafter) (J.A. 273) was entered on the grant of appellees' motion for summary judgment (J.A. 108). Appellants' motion for summary judgment or in the alternative to dismiss (J.A. 137) was denied (J.A. 273).

## DECISION

We reverse the judgment in favor of the appellees and direct entry of an order for appellants denying appellees' motion for summary judgment [sic], and remand the action to the District Court for further proceedings consistent with this opinion.

The summary of the material facts and the reasons for this decision follow.

### The Reasoning of the District Court

The reasoning of the District Court is set forth in its memorandum containing its findings of fact and conclusions of law (J.A. 274–279) as follows:

This suit is an action challenging the Department of Energy's ability to attach its unexpressed but intended meaning to a regulation promulgated under the Department of Energy's rule making authority. The plaintiffs are property owners in Cochran County, Texas who claim that their oil producing property is entitled to treatment as marginal property under Department of Energy rules. The Department of Energy maintains, however, that the plaintiffs' property is not marginal property and that therefore the plaintiffs are not entitled to the price allowances made for oil produced on marginal property. This difference of opinion concerns the definition of the phrase "wells that produced crude oil" and this court is called upon to construe and declare the meaning of that phrase. The action is now before the court on cross motions for summary judgment and the defendants' motion to dismiss.

The facts in this case are fairly simple and for the most part have been stipulated. The parties have agreed that under the plaintiffs [sic] definition of the phrase "wells that produced crude oil", the Cochran County property is marginal prop-

erty. On the other hand, the parties have also agreed that if the Department of Energy's definition is proper the Cochran County property is not marginal property. Additionally, the property has been certified as marginal property by the plaintiffs effective June 1, 1979.

The reason there is a conflict over the proper classification for the plaintiffs' property lies in the Marginal Property Rule itself. Appearing at 10 C.F.R. § 212.72, the rule was promulgated in 1979, with the purpose of regulating the price of crude oil produced from marginal property. Marginal property is defined as property whose average daily production per well in 1978 did not exceed specified maximums at various completion depths. Average daily production is defined as the total production of crude oil produced from a property, divided by 365 times the number of wells that produced crude oil from the property in 1978. Unfortunately, the body of the rule does not define "wells that produced crude oil" or "well" and the parties to this suit are claiming differing definitions to these terms.

The plaintiffs assert that a well that produces crude oil is any well that assists in the production of crude oil. Under their definition of the regulatory term, recovery wells as well as injection wells would be included in the definition of "wells that produced crude oil." The Department of Energy adopts the position that only recovery wells are included in the phrase "wells that produced crude oil." For the purposes of this opinion, recovery wells can be described as wells from which crude oil actually flows. Injection wells can be described as wells through which substances are forced into the subsurface. The purpose of this injection procedure is to increase pressure in subterranean petroleum reservoirs forcing more crude oil to the surface through recovery wells.

Before the court can consider whether it may construe the disputed terms, the defendants' motion to dismiss for failure to state a claim upon which relief can be granted must be considered. The Department of Energy asks that the complaint be dismissed because, they contend, it impermissibly asks the court to rewrite the Marginal Property Rule to include the counting of injection wells. In support of this argument the Department of Energy states that a court may not rewrite an administrative regulation nor may it invalidate one part and allow the remaining parts to stand. While the court is in agreement with this statement of the law, it does not find it applicable in this case. The court does not perceive that the plaintiffs seek to have any portion of the Marginal Property Rule struck down or expanded. Rather, it appears to the court that they only seek to have a portion of the rule defined in order to avoid possible civil and criminal sanctions. Since the terms they seek to have defined are not defined within the body of the regulation, this court does not find that it is being asked to impermissibly rewrite or strike down any portion of the regulation. Accordingly, the motion to dismiss is denied.

Both parties have also filed motions for summary judgment and while the parties have differed in their approach to resolution of this case upon summary judgment they basically argue the same issue. That issue being a definition of "wells that produced crude oil." The plaintiffs go directly to the dispute and simply ask the court to construe the term and give the regulation its plain meaning. On the other hand, the Department of Energy has colored the question before the court as one of procedural and substantive validity. Nevertheless, the court is of the opinion that the proper resolution of this case requires the court to construe the words "wells that produced crude oil" and that after that determination is made, summary judgment will be proper.

The Department of Energy contends that it is clear in the body of the regulation that they did not intend to count injection wells when enumerating "wells that produced crude oil." In support of this position the Department of Energy con-

tends that the plaintiffs have not even attempted to dispute the facts that their present position has been the definitive agency position since Ruling 1974–29, a 1974 Department of Energy regulation dealing with stripper wells. Moreover, the Department of Energy states that it was abundantly clear in the Preamble to the Marginal Property Rule published in the Federal Register that the Department of Energy did not intend to include injection wells as "wells that produced crude oil." The Department of Energy has failed, however, to show this court precisely where in the regulation that one could turn, to know their intended meaning. Contending that they have long held their present position and pointing to the Preamble, which does not appear in the Code of Federal Regulations, does not indicate to this court that an individual subject to regulations could operate free from fear of civil and criminal sanctions if he were to be guided only by the rules appearing in the Code of Federal Regulations. Further, it appears to the court that absent the definition an individual could violate the intended but unexpressed terms of the regulation. Such an effect cannot be condoned because agency regulations must be reasonably apprehensible to individuals subject to regulation. *Tenneco v. Federal Energy Administration*, 613 F.2d 298, 302 (Em.App. 1979).

The determination that the Department of Energy has not sufficiently expressed itself does not resolve the issue before the court. The question is still one of construction and in this regard the court has considered whether the term is ambiguous. Both parties have asserted that the term is unambiguous and that the court should give it its plain meaning.[1] (Footnote [1] Alternatively, the Department of Energy has asserted that the term is ambiguous. The court understands the Department to take this position in the event the court should rule adversely to it. The reason for this assertion is because they would like the court to consider the regulation's history in construing the regulation if it is ambiguous. How the court could consider this evidence only after it has ruled, however, was not indicated to the court.) Unfortunately, the parties disagree regarding that plain meaning.

In the eyes of the court this difference of opinion raises a separate question whether the two parties claiming differing meanings to the same word can create ambiguity themselves or whether the words of the regulation itself must reflect the ambiguity. The court is mindful, however, that parties should not be allowed to refer to extrinsic aids in order to create ambiguity but only to resolve it. 2A Sands, Statutes and Statutory Construction § 46.04 (3d ed. 1973). Accordingly, it is the duty of this court to determine first if the words "wells that produced crude oil" have a plain meaning and then, only if they don't, to allow extrinsic aids to resolve any ambiguity. Moreover, the court is of the opinion that since the term used is used in a regulatory framework it must be viewed from an industry standpoint. The court reaches this conclusion because the term has no relevant meaning outside the industry and the regulations subject only those within the industry to their control.

In investigating the plain meaning of "wells that produced crude oil" the court has examined the transcripts of two prior hearings held before this court on February 26, 1979 and before Judge Robert M. Hill on April 7, 1978, which the parties have made part of the record in this case. Additionally, the court has reviewed other materials submitted to the court by the parties in support of their motions. After a careful and thorough reading of these transcripts and the other materials the court has reached the conclusion that the regulatory term has a plain meaning and that the plain meaning would include the counting of injection wells. At several points throughout the transcripts the petroleum experts examined made it clear that injection wells are wells that produce crude oil and that injection wells are normally counted as such. (April 7, 1978 Transcript pp. 13–16, 35, 63–65; February 26, 1979 Transcript pp. 72–73). While the court is aware that the Department of Energy would argue a contrary reading the court finds that the portions of the transcripts that the Department directs the court to examine not persuasive. The Department of Energy seeks to persuade the court that the dichotomy drawn between "producing wells" and "injection wells" in the transcripts is the same one that exists between "wells that produced crude oil" and "injection wells." The court does not find that argument accurate and instead is of the opinion that the terms "produc-

ing wells" and "wells that produced crude oil" cannot be equated with each other. The general context of the transcripts leads the court to this conclusion as well as specific testimony within the transcripts that establishes that a hydraulic relationship exists between injection and recovery wells and with the absence of one or the other there would be no production in a secondary recovery unit. This testimony evidences the clear interdependence of the wells upon each other in order to produce crude oil.

Moreover, the court has considered the treatment given injection wells by other energy regulatory bodies. In examining what other regulatory bodies have done the court is cognizant that their interpretation would not be binding upon the Department of Energy in promulgating its rules, but the court does believe that other agency and commission interpretations would be illustrative of industry usage. The Texas Railroad Commission appears to consider injection wells as wells that produce crude oil by allowing the counting of injection wells in the determination of production allowables. Similarly the Commission of Conservation of Louisiana and the Oil Conservation Commission of New Mexico provide for the counting of injection wells in calculating allowables. Further, the United States Department of Interior has recognized the counting of injection wells as wells that produce crude oil in allocating royalties on leased public lands. *See Marathon Oil Co. v. Kleppe*, 556 F.2d 982, 985 (10th Cir. 1977). From the foregoing it is clear to the court that producers subject to regulation from these agencies would normally believe that the plain meaning of the words "wells that produced crude oil" would include injection wells.

*The court is aware that the conclusion it reaches today is contrary to the intent of the Department of Energy expressed in the Preamble to the rule and published in the Federal Register.* This regulatory history is relevant but since the court is of the opinion that "wells that produced crude oil" has a plain or unambiguous meaning the court chooses to disregard it in favor of the plain meaning. This decision is made on a basis that language of a regulation must reasonably bear its intended meaning and a court may not sanction a regulation that was intended but never enacted. *Tenneco Oil Co. v. Federal Energy Administration*, 613 F.2d 298, 303 (Em.App.1979); *Diamond Roofing v. Occupational Safety & Health Review Commission*, 528 F.2d 645, 649 (5th Cir. 1976). Moreover, fundamental fairness requires that when one may become subject to civil or criminal sanctions the language creating that possibility must adequately express it. *Longview Refining Co. v. Shore*,[1] 554 F.2d 1006, 1014 n.20 (Em.App.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98. Here, the Department of Energy has failed to adequately express their intention and therefore the plain meaning of the words must control.

Accordingly the court declares and construes that injection wells are included within the term "wells that produced crude oil." The plaintiffs' motion for summary judgment is granted and the defendants' motions for summary judgment and to dismiss are denied.

A judgment will be entered in accordance with the above and the Department of Energy is hereby enjoined from excluding the counting of injection wells in the application of the Marginal Property Rule to the plaintiffs' property. (Emphasis and footnote added.)

---

1. Note 20 of *Longview Refining Co. v. Shore*, 554 F.2d 1006 at 1014 (Em.App.1977), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977) cited by the District Court was explained on other issues in *Dyke v. Gulf Oil Corp.*, 601 F.2d 557 (Em.App.1979).

*The Contentions of the Parties on Appeal*

On appeal appellants assert the following contentions:

A. The Marginal Property Rule precludes the counting of injection wells in determining eligibility for the exemption (Appellants' Brief, 6) relying on prior decisions of this Court; and

B. The District Court's application of the "Plain Meaning" rule was clearly erroneous (Appellants' Brief, 11).

In opposition the appellees contend that:

A. The prior decisions of this Court are unapplicable (Brief of Appellees, 5); and

B. The "Plain Meaning" of the term "wells that produced crude oil" includes injection wells (Brief of Appellees, 11).

*Contentions of Amicus Curiae on Appeal*

The brief of *amicus curiae* Exxon attempts to support the judgment of the District Court on the same grounds relied on by the District Court and asserted by appellees, and also on additional grounds (1) contending that there are differences in this appeal and the continuing "stripper well" litigation of which *Energy Reserves Group, Inc. v. Department of Energy*, 589 F.2d 1082 (Em.App.1978) and *Duncan v. Theis*, 613 F.2d 305 (Em.App.1979) are a part, and (2) drawing in issue the effect of decisions of the Judicial Panel on Multidistrict Litigation in *In re The Department of Energy Stripper Well Exemption Litigation*, 472 F.Supp. 1282 (Jud.Pan.Mult.Lit.1979).

■■ In the absence of exceptional circumstances not present in this case, *amicus curiae* cannot expand the scope of this appeal to implicate issues that were not presented by the parties. *National Commission on Egg Nutrition v. FTC*, 570 F.2d 157, at 160 (n.3) (7th Cir. 1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978); *Knetsch v. U.S.*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128, at 134 (1960). And in the absence of exceptional circumstances, *amicus curiae* is not entitled to introduce additional evidence (particularly evidence offered in another action after entry of the judgment which is the subject of this appeal). *Petition of Oskar Tiedemann and Co.*, 289 F.2d 237 (3rd Cir. 1961). But all germane arguments of *amicus curiae* supporting the position of the appellees will be considered.

*The Complaint in the District Court*

In their comprehensive complaint (R. 2–11), accompanied by their motion for preliminary injunction (R. 12–15), appellees sought (a) a declaratory judgment that Ruling 1974–29, described hereinafter, and the Marginal Property Rule as limited thereby were both invalidly issued in violation of the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. 751 *et seq.*, the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.*, and the Federal Energy Administration Act (FEAA), 15 U.S.C. 761 *et seq.*; and (b) a declaration of the illegality of, and an injunction against the actions of the appellants for violations of rights of appellees under the Constitution of the United States.

Jurisdiction, which is not controverted, was asserted under § 5(a)(1) of the EPAA incorporating § 210(a) and § 211(a) of the Economic Stabilization Act (ESA), now published as a note to 12 U.S.C. § 1904, and under 28 U.S.C. §§ 1331, 2201 and 2202.

In their complaint appellees further stated in substance the following allegations.

1. Appellees are owners of "working interests" in the C.S. Dean "A" Unit (Dean Unit), a petroleum producing property, on which secondary water injection operations were initiated in July 1966; then there were 82 active "recovery wells" and 12 injection wells; that to increase production "significantly" from the Dean Unit it was necessary to drill new wells and convert several of the (recovery) wells to water injection wells; and that during 1978 there were 94 "recovery wells" in the Dean Unit and 73 injection wells (R. 4).

2. In 1973 Congress mandated a program of price controls for domestic crude oil sales, specifically exempting crude oil

produced from low volume "stripper oil properties" (or "stripper wells") defined as "... Any lease whose average daily production of [crude oil] for the preceding calendar month does not exceed ten barrels per well ...." § 406(a) of the Trans-Alaska Pipeline Authorization Act (TAPAA) (current version at 43 U.S.C. § 1651 et seq.)[2] (R. 4).

3. In November 1973 the CLC promulgated a regulation, 6 C.F.R. 150.54(s), to implement the "stripper well" exemption which (was misquoted by appellees, but properly quoted) provided in part as follows:

(1) Rule. Effective November 27, 1973, the price charged for the first sale of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from any stripper well lease is exempt ....

'Average daily production' means the qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of calendar days in that year times the number of wells which produced crude petroleum and petroleum condensates including natural gas liquids from that property in that year ....

'Stripper well lease' means a 'property' whose average daily production of crude petroleum and petroleum condensates, including natural gas liquids, per well did not exceed 10 barrels per day during the preceding calendar year.

This regulation, with an amendment changing the qualifying period to any 12 month period after December 31, 1972, remains in effect in 10 C.F.R. § 212.54 (R. 5).

4. On December 24, 1974 the FEA, predecessor of DOE, published Ruling 1974–29 in which it was ruled that injection wells were not considered "wells" for the purpose of determining whether a property qualified for the stripper well exemption (R. 5). Ruling 1974–29, incorporated by reference in the preamble of the Marginal Property Rule published in the Federal Register, reads as follows:

PRODUCTION WELLS FOR PURPOSES OF THE "STRIPPER WELL LEASE" EXEMPTION

Facts. Firm P, a producer of petroleum, produced during the preceding calendar year 150,000 barrels of crude petroleum and petroleum condensates, including natural gas liquids from 40 production wells located on Property A, as defined in 10 CFR 210.32. In addition, there were five injection wells in operation on that property last year. An injection well is one which is used to inject water, air, gas, steam or other materials into the ground to assist in the recovery of crude petroleum through producing wells. Wells which formerly produced crude petroleum may be used for injection purposes, or new wells may be drilled solely for the purpose of injecting materials into oil-bearing formations and reservoirs.

The average daily production per well from Property A was 10.27 barrels, based on the 40 production wells, whereas the average daily production per well would be 9.13 barrels if 45 wells, including the 5 injection wells, were used to calculate the average daily production figure.

Issue. Is an "injection" well a "well" for the purpose of determining whether the average daily production of a property was 10 barrels or less per well in the preceding calendar year, for purposes of the stripper well lease exemption of 10 CFR 210.32?

Ruling. No. Under the FEA regulations, the first sale of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced

---

2. The exemption was reenacted in Section 4(e)(2)(A) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751 et seq., repealed for a brief time in 1975 by Section 401(b)(1) of the Energy Policy and Conservation Act, Pub.L. 94–163, and later reinstated by Section 121 of the Federal Energy Administration Amendments of 1976, Pub.L. 94–385, 15 U.S.C. § 757(i). See history in Energy Reserves Group, Inc. v. DOE, 589 F.2d 1082, at 1087–1091 (Em.App.1978), clarified in Duncan v. Theis, 613 F.2d 305 (Em.App.1979).

from any stripper well lease, is exempt from the mandatory price and allocation regulations. A stripper well lease is defined as a property whose average daily production did not exceed 10 barrels per day per well during the preceding calendar year. "Average daily production" is further defined in 10 CFR 210.-32(b) as:

The qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of days in that year times the number of wells which produce crude petroleum and petroleum condensates, including natural gas liquids, from that property in that year.

Thus, the FEA regulations by their specific language provide that only wells "which produce crude petroleum" are to be counted in calculating average daily production for the purpose of determining whether the stripper well lease exemption applies. While injection techniques help to "produce" crude petroleum, they are not wells which themselves "produce" crude petroleum. Therefore, wells which did not actually yield or produce crude petroleum during the preceding calendar year are not production wells for this purpose. Whether the non-producing well was an "injection" well, a disposal well, a dry well, a spent well or a shut-in well will not change this result.

Ruling 1974–29 was upheld as an interpretative rule in *Energy Reserves Group, Inc. v. DOE*, 589 F.2d 1082 (Em.App.1978), clarified in *Duncan v. Theis*, 613 F.2d 305 (Em. App.1979).

5. On April 12, 1979 the DOE, successor to CLC and FEA, published a regulation, effective June 1, 1979, known as the "Marginal Property Rule", 44 Fed.Reg. 22010 (April 12, 1979) 10 C.F.R. 212.72,[3] which provides, in part, as follows (R. 5–6):

'Marginal property' means a property whose average daily production of crude oil (excluding condensate recovered in non-associated production) per well during calendar year 1978 did not exceed the number of barrels shown in the following table for the corresponding average completion depth:

| [Average completion depth in feet] | [Barrels per day] |
|---|---|
| 2000 or more but less than 4000 | 20 |
| 4000 or more but less than 6000 | 25 |
| 6000 or more but less than 8000 | 30 |
| 8000 or more | 35 |

6. The Marginal Property Rule also provides that a producer with properly qualifying marginal property under the rule can sell most of the crude oil from the property at upper tier prices effective June 1, 1979, and all of the crude oil at upper tier prices beginning January 1, 1980. (R. 6).

7. In the preamble of the Marginal Property Rule, DOE stated its intention to apply Ruling 1974–29 in determining whether a property qualified as a Marginal Property (R. 6; 44 Fed.Reg. 22010, *supra*, and to exclude injection wells in the count of "wells that produced crude oil". 44 Fed. Reg. 22014, *supra*).

8. Appellees' complaint states five grounds for relief (each probably unnecessarily designated serially as a "Claim For Relief", 2A *Moore's Federal Practice* ¶ 10.-03).

9. Appellees state in a "First Claim for Relief" (R. 6–7) that:

(1) the Marginal Property Rule "as modified by Ruling 1974–29 was not issued in accordance with applicable rulemaking procedure" for reasons (a) failure to define "well" and to exclude injection wells from that definition; (b) publication of the Marginal Property Rule without opportunity for comment from interested parties; (c) stating its intent to apply Ruling 1974–29; (d) Ruling 1974–29 was published in 1974 without prior notice or opportunity for comment and pur-

3. The Marginal Property Rule was later published with corrections that are immaterial here

on April 27, 1979. 44 Fed.Reg. 25160.

ported to define the term "well" only for purposes of the "stripper well" exemption, and in a manner contrary to the meaning of "well" in the petroleum industry, and as historically defined by state regulatory agencies, the Department of Interior and the Internal Revenue Service; and (e) that implementation in the Marginal Property Rule of the definition of "well" in Ruling 1974–29 would substantially affect the price and appellees financially; and

(2) the Marginal Property Rule, as interpreted by DOE amends the term "well" as used in the regulations and therefore is a new "rule" as defined in the APA and has a substantial impact on individuals and businesses in the national economy; and promulgation of the Marginal Property Rule was an attempt to contravene the mandatory notice and comment statutory procedures of the APA and FEAA, and therefore is invalid.

10. Appellees state in a "Second Claim for Relief" (R. 7–8) that: (a) "Ruling 1974–29 as applied to the Marginal Property Rule is invalid for the reason that it was issued in excess of FEA's statutory authority"; (b) the definition of the term "well" in Ruling 1974–29 is contrary to the clear meaning of "well" as understood by Congress, the industry, and state and federal regulatory agencies; (c) the Marginal Property Rule does not state that injection wells may not be counted as wells that produce crude oil for purposes of the rule; (d) injection wells are an integral part of the production of crude oil from secondary recovery projects; (e) without injection wells the recovery of crude oil would be reduced and possibly cease; and (f) application of Ruling 1974–29 discourages production of domestic crude oil and therefore contravenes the EPAA.

11. Appellees state in "Third Claim for Relief" (R. 8–9) that: (a) the issuance of Ruling 1974–29 and the limitation thereby of the Marginal Property Rule was arbitrary, capricious and an abuse of discretion prohibited by the APA; (b) there was no

rational basis for the ruling of FEA that injection wells may not be considered to be wells for purposes of the Marginal Property Rule because these wells "are an integral part of the operation of a water-flood project space ... [and] often incur the same drilling and maintenance costs as active recovery wells"; and (c) the limited construction of the term "well" ignores a substantial part of the cost of operating secondary recovery properties and discourages domestic crude oil production.

12. Appellees state in their "Fourth Claim for Relief" (R. 9) that: (a) their domestic crude oil producing operations are substantially less profitable because they are unable to sell the production from their Dean Unit at upper tier prices; (b) the inability of appellees to sell the production from their Dean Unit at upper tier prices is the requirement of Ruling 1974–29 as a limitation on the Marginal Property Rule; and (c) appellees have suffered legal wrongs because of the rulings issued by FEA and DOE, now enforced by DOE.

13. Appellees in their "Fifth Claim for Relief" (R. 10) summarizes its foregoing allegations and contentions.

*Appellees Motion for Summary Judgment*

Appellees filed a Motion for Summary Judgment "on the ground that there is no genuine issue as to any material fact and Plaintiffs are entitled to judgment as a matter of law" (J.A. 108). This motion was accompanied by a verified Statement of Uncontroverted Facts and Issues of Law, under Local Rule 5.2 of the District Court (J.A. 109–115), and a Memorandum in Support of Plaintiffs' Motion for Summary Judgment (J.A. 116–133). Appellants in opposition filed a Response to Plaintiffs' Motion for Summary Judgment (J.A. 134–136). Appellants filed a Motion for Summary Judgment, or in the Alternative, Motion To Dismiss (J.A. 137), which was accompanied by a Memorandum of Law in Support of Defendants' Motion to Dismiss and Motion for Summary Judgment (J.A. 138–150) with Exhibits (J.A. 151–204). Appellees filed a Response to this latter Memorandum (J.A.

205–207) and a Supplemental Memorandum in support of Appellees' Motion for Summary Judgment (J.A. 208–216). Appellants filed a Response to the latter Appellees' Memorandum of Authorities (J.A. 217–221) with Exhibits (J.A. 222–271).

The parties stipulated and agreed that testimony (J.A. 337–513) given "in certain preliminary injunction hearings previously. had before [the District] Court or courts from which the cases were transferred to this Court may be utilized or taken judicial notice of in this action" (J.A. 118).

We conclude that this testimony described in this stipulation and contained in the record (J.A. 337–513) is inadmissible and ineffective to support the contentions of the appellees contrary to the unambiguous meaning of the Marginal Property Rule, described hereinafter.

### The Stipulation of the Parties In The District Court Narrowing The Issue

Despite the wide range of the claims and contentions of the appellees the crucial issue on this appeal was clearly identified in the District Court wherein it was stipulated (J.A. 118) as follows:

"*Stipulations*—The parties have agreed in open court that (a) if injection wells are included within the regulatory term, the property in question, the C. S. Dean "A" Unit, Cochran County, Texas (herein called "the Dean Unit"), is a marginal property, (b) *if injection wells are not so included, the Dean Unit is not a marginal property . . . effective June 1, 1979."* (Emphasis added.)

The question for decision by this Court on this appeal is simply whether, under a proper construction of the Marginal Property Rule, injection wells may be counted "as wells that produced oil".

█ We conclude that injection wells may not be counted as "wells that produced oil" in the application of the Marginal Property Rule; and that the summary judgment for appellees of the District Court to the contrary must be reversed, and the cause remanded for further proceedings consistent with this conclusion.

The District Court reached a conclusion that, under the Marginal Property Rule, injection wells may be counted "as wells that produced oil" for two principal reasons, namely: (1) the obvious contrary intent of DOE expressed in the preamble by reference to Ruling 1974–29 should be disregarded; and (2) without the preamble the regulation had a plain meaning that injection wells could be counted as "wells that produced oil". If either, or both, of these reasons are erroneous, the judgment of the District Court should be reversed. We conclude that both reasons given by the District Court are erroneous.

### Reasons for Decision

#### I

█ The District Court was not free to disregard the obvious intention of DOE to exclude injection wells from the count of "wells that produced oil" which DOE clearly expressed: (a) by including in the preamble to the Marginal Property Rule an incorporation by reference to Ruling 1974–29; (b) by including the following definition concerning "average completion depth"

In order to determine whether a particular property qualifies as a marginal property, the producer must first calculate the property's "average completion depth" of all wells that produced crude oil on the property during the qualifying period. This calculation involves dividing the sum of the completion depths for all such wells by the number of those wells. *Injection wells and other wells that did not produce crude oil during the qualifying period may not be counted for purposes of these calculations.* (Emphasis added.) 44 Fed.Reg. 22014 (R. 151–160 at 155);

and (c) by including the following definition concerning "average daily production"

A property's average daily production during the qualifying period must be determined in the same way as it is done for stripper well properties, and the provisions of the relevant stripper well property rulings will be applicable with respect to such computations. Accordingly,

in calculating a property's average daily production, for example, *a producer may not count injection wells or other wells that did not produce crude oil during the qualifying period.* (Emphasis added.) 44 Fed.Reg. 22014 (R. 151–160 at 155).

It is well settled by decisions of this Court that the preamble to a regulation of DOE and its predecessors should be considered in construing the regulation and determining the meaning of the regulation. Part I of *UPG, Inc. v. Edwards, Secretary of DOE,* 647 F.2d 147 (Em.App.1981); *Sauder v. DOE,* 648 F.2d 1341 (Em.App.1981); *McWhirter v. Texaco, Inc.,* 668 F.2d 511 (Em.App.1981); *Mountain Fuel Supply Co. v. DOE,* 656 F.2d 690 (Em.App.1981).

In the construction of the Constitution of the United States, statutes and regulations, the federal rule permits and requires consideration of preambles in appropriate cases. For examples, the preamble to the Constitution of the United States was considered in *Dred Scott v. Sanford,* 60 U.S. 393, at 410, 19 How. 393, at 410, 15 L.Ed. 691, at 703 (1857); *M'Culloch v. Maryland,* 17 U.S. 159, at 247, 4 Wheat 316, at 404, 4 L.Ed. 579, at 601 (1819); and in other cases. *Cf.* 16 Am.Jur.2d, *Constitutional Law,* § 87, 414.

A rule that, in construing a regulation of DOE, excludes consideration of materials not in the codification of the regulation in the Code of Federal Regulations is erroneous because: (1) the rule is contrary to the requirement of the Federal Register Act, § 1507, Title 44 U.S.C. that the publication of the regulation be judicially noticed; (2) the rule is contrary to the necessity of considering the separate underlying statute; and (3) the rule is contrary to the necessity to consider the legislative history of the underlying statute in appropriate cases. 2A Sands, *Sutherland Statutory Construction* (4th ed.) Chapter 48, §§ 48.01–48.20, 181–227.

Further, there is no support for the view that, under federal rules of construction of statutes and legislative regulations, definitions in a preamble may be ignored. The rule is contrary to this view. *Western Union Telegraph Co. v. Lenroot,* 323 U.S. 490, at 501, 65 S.Ct. 335, at 341, 89 L.Ed. 414, at 423 (1944). 1A Sands, *Sutherland Statutory Construction* (4th ed.), § 20.08, 59–61; 2A Sands, *Sutherland Statutory Construction* (4th ed.), § 47.04, 76–80.

Appellees' reliance on Sands, *Sutherland Statutory Construction* (3rd ed.), § 46.04 (now § 47.04 in the 4th edition), is misplaced. While noting some undesirable variations in statutory construction, the treatise cited clearly and strongly supports reference to the preamble as one of the means of statutory construction.

Furthermore, in the absence of exceptional circumstances not present in this action, the interpretation given by an administrative agency to regulations promulgated by it are entitled to deference unless it is plainly erroneous or inconsistent with the regulation. *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, at 413–414, 65 S.Ct. 1215, at 1217, 89 L.Ed. 1700 (1945); *Cf. Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), *reh. denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965), involving construction of a statute by an administrative agency possessing expertise. 2 Davis, *Administrative Law Treatise* (2d ed.), § 7:22, 105–108.

Appellees contend and the District Court concludes that failure to publish the preamble in the Code of Federal Regulations (C.F.R.) is significant as a reason for disregarding the preamble. This conclusion is clearly erroneous.

The C.F.R. in each volume contains an accurate *"Explanation"* of the legal status of the C.F.R. and the Federal Register (as in Volume 10, *Energy,* Parts 200 to 499, revised as of January 1, 1980) which is in part as follows:

The Code of Federal Regulations is a codification of the general and permanent rules published in the Federal Register by the Executive departments and agencies of the Federal Government. The Code is divided into 50 titles which represent broad areas subject to Federal regulation. Each title is divided into chapters which usually bear the name of

the issuing agency. Each chapter is further subdivided into parts covering specific regulatory areas.

\* \* \* \* \* \*

LEGAL STATUS

*The contents of the Federal Register are required to be judicially noticed (44 U.S.C. 1507).* The Code of Federal Regulations is prima facie evidence of the text of the original documents (44 U.S.C. 1510).

HOW TO USE THE CODE OF FEDERAL REGULATIONS

The Code of Federal Regulations is kept up to date by the individual issues of the Federal Register. These two publications must be used together to determine the latest version of any given rule. (Emphasis added.)

\* \* \* \* \* \*

The C.F.R. is part of the Federal Register system provided by the Federal Register Act, 44 U.S.C. §§ 1501–1511 inclusive, supplemented by 1 C.F.R. §§ 1.1–51.12 inclusive. *See* 2 Mezines, Stein, and Gruff, *Administrative Law* §§ 7.02[1] and 8.01.

 The failure to publish the preamble in C.F.R. may be important in a proceeding to impose criminal penalties based on criminal intent. *National Helium Corp. v. FEA*, 569 F.2d 1137, at 1145 (Em.App.1978). But the failure does not support appellees in this civil proceeding.

Finally, the prior decisions construing the interpretative stripper well Ruling 1974–29 to be consistent with a similar underlying statute are decisive. *Energy Reserves Group, Inc. v. DOE*, 589 F.2d 1082 (Em.App. 1978), clarified in *Duncan v. Theis*, 613 F.2d 305 (Em.App.1979).

II

The second reason given by the District Court for its judgment was that, disregarding the preamble, the remainder of the regulation supported the judgment under the "plain meaning" rule of construction. We find this application of the plain meaning rule to be error whether the preamble was considered or disregarded.

The critical phrase "average daily production" had earlier acquired a meaning by administrative interpretation in Ruling 1974–29 that excluded injection wells in calculating whether average daily production was 10 barrels or less for the purpose of the statutory stripper well lease exemption and regulation 10 C.F.R. § 210.32(b) (the latter of two consistent implementing regulations). *Energy Reserves Group, Inc. v. DOE*, 589 F.2d 1082 (Em.App.1978), clarified in *Duncan v. Theis*, 613 F.2d 305 (Em. App.1979).

 In reaching a conclusion that the Marginal Property Rule (disregarding the preamble) had a plain meaning contrary to the preamble to the Marginal Property Rule, contrary to the interpretation by DOE and contrary to the interpretation by this Court in the stripper well exemption cases, the District Court relied on extrinsic evidence consisting of selected portions of oral testimony by witnesses (much of which was consistent with the preamble) (J.A. 337–513) from the industry before another judge (J.A. 277–278), and practices of state regulatory bodies and the Department of Interior in calculating allowables and royalties (J.A. 278). The contrary selected oral testimony (J.A. 277–278) was not admissible to rebut the preamble of the Marginal Property Rule, the interpretation of DOE, and the interpretation of this Court. In construing and reviewing administrative regulations of DOE, and its predecessors, the District Court must focus on "how the FEA, not the refiners, interpreted the regulations . . . ." *Standard Oil Co. v. DOE*, 596 F.2d 1029, at 1067 (Em.App.1978).

The exclusion of injection wells in determining the average daily production of crude oil is consistent with even the *general* definitions recognized by the industry and published in Williams and Meyers, *Manual of Oil and Gas Terms*, 4th ed. 1976.

*Injection Well* (at page 291)

A well employed for the introduction into an underground stratum of water or gas under pressure. Injection wells are employed for the disposal of salt water

**90**

produced with oil. They are also employed in a pressure maintenance, secondary recovery or recycling operation to introduce a fluid into the producing formation to maintain underground pressures which would otherwise be reduced by virtue of the production of oil and/or gas. *Syn.:* Input well.

An injection well is treated for Federal income tax purposes as part of production, and costs of drilling may be capitalized or deducted as intangibles. Breeding and Burton, *Income Taxation of Natural Resources* ¶¶ 14.13, 15.21 (1971).

When a sliding scale (step-scale) royalty is based on average daily production per well, the lease or unit agreement involved should be specific as to which (if any) injection wells may be counted as producing wells for the purposes of determining average daily production per well. See *Marathon Oil Co.,* 81 I.D. 447, 16 IBLA 298, GFS (O&G) 62 (1974); *Atlantic Richfield Co., Marathon Oil Co.,* 81 I.D. 457, 16 IBLA 329, GFS (O&G) 63 (1974). The decisions in these cases were set aside in *Marathon Oil Co. v. Kleppe,* 407 F.Supp. 1301 (D.Wyo.1975).

*Producing Well* (at pages 453 and 454)

A well that produces oil or gas. It is not a term of art, for it may mean a well that produces in paying quantities (that is, a well for which proceeds from production exceed operating expenses) or it may mean a well that produces in any quantity whatsoever. The term does not include a well that has discovered oil or gas but does not produce either. *Rogers v. Osborn,* 152 Tex. 540, 261 S.W.2d 311, 2 *O. & G. R.* 1439 (1953); *Holchak v. Clark,* 284 S.W.2d 399, 5 *O. & G. R.* 595 (Tex.Civ. App.1955, error ref'd). When the meaning of the term arises in connection with the termination of an interest created for a term of years and so long thereafter as oil or gas is produced, it is usually held that producing well means a well producing in paying quantities. See *Alsip's Adm'r v. Onstott,* 283 S.W.2d 711, 5 *O. & G. R.* 334 (Ky.1955).

See PRODUCTION IN PAYING QUANTITIES; WELL.

In *Aeroplane Oil & Refining Co. v. Disch,* 203 Ky. 561, 262 S.W. 939 (1924), the court declared that it was shown by proof that oil men do not consider a well a producing well unless it produces at least five barrels a day, but in construing an instrument that contained this term, *it applied the meaning of the term in ordinary speech, that is, a well that is producing some oil.* (Emphasis added.)

■ The reported practices and interpretations of state regulatory commissions and the Department of Interior for other purposes, relied on by the District Court, are not effective to rebut the contrary meaning and administrative interpretation of the Marginal Property Rule by DOE. This was expressly held in *Energy Reserves Group, Inc. v. DOE,* 589 F.2d 1082, at 1098–1099 (Em.App.1978), clarified in *Duncan v. Theis,* 613 F.2d 305 (Em.App.1979).

*Remaining Issues*

The record in this case is probably sufficient to permit consideration of the propriety of the denial by the District Court of the motion of appellant DOE for summary judgment or in the alternative to dismiss (J.A. 137). The District Court, however, did not pass on the remaining issues in its memorandum of findings of fact and conclusions of law. And the remaining issues were not briefed and argued in this appeal. Therefore they will not be decided now. Without suggesting that there is any merit in appellees' remaining contentions, the action will be remanded for further proceedings consistent with this opinion.

*Conclusion*

For the foregoing reasons, the judgment of the District Court, including but not limited to the grant of injunctive and declaratory relief, is reversed and the action is

remanded for further proceedings consistent with this opinion.

In No. 5–53 appellants filed a premature notice of appeal while appellants' timely motion under Rule 59, F.R.Civ.P., for reconsideration (to alter and amend the judgment) was pending. It is hereby

ORDERED that this premature appeal be, and it is hereby, dismissed.