**HYDROCARBON TRADING AND TRANSPORT COMPANY, INC., Plaintiff,**

v.

**EXXON CORPORATION, Defendant.**

**No. 80 Civ. 2450 (JES).**

United States District Court, S.D. New York.

Aug. 26, 1983.

Collier, Shannon, Rill & Scott, Washington, D.C., Carl S. Levine, P.C., New York City, Bailey & Bailey, Houston, Tex., for plaintiff; William W. Scott, Mark L. Austrian, John B. Williams, Washington, D.C., William G. Bailey, Houston, Tex., of counsel.

Robert L. Norris, Barbara Finney, Houston, Tex., Miller & Chevalier, Chartered, Washington, D.C., for defendant; Albert P. Lindemann, Jr., Kenneth M. Bialo, New York City, Donald B. Craven, Robert K. Huffman, James P. Tuite, Washington, D.C., of counsel.

## OPINION & ORDER

SPRIZZO, District Judge.

Plaintiff, Hydrocarbon Trading and Transport Company, Inc. ("HTT"), an independent distributor of petroleum products, commenced this action against Exxon Corporation ("Exxon"), a producer, refiner and distributor of petroleum products, alleging that Exxon violated The Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, as incorporated into 15 U.S.C. § 753 (1976 & Supp. IV 1980), by refusing to supply it with gasoline in March, April and May of 1979 and 1980.

During the energy crisis, shortages of petroleum products caused disruption in the economy and the failure of many businesses in the petroleum industry. *See* H.R.Rep. No. 531, 93d Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Ad.News, pp. 2582, 2586; Conference Report 93–628, Joint Explanatory Statement of the Committee of Conference, 93d Cong., 1st Sess., *reprinted*

*in* 1973 U.S.Code Cong. & Ad.News, p. 2689. In an effort to deal with these problems, Congress enacted the Emergency Petroleum Allocation Act (the "EPAA"), 15 U.S.C. §§ 751–760, which required the President, *inter alia,* to promulgate regulations to insure the equitable distribution of petroleum products and to preserve the competitive viability of nonbranded, independent marketers. 15 U.S.C. § 753(b)(1)(D) and (F); *see* H.R.Rep. No. 531, 93d Cong. 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Ad. News, p. 2586.[1]

The Mandatory Petroleum Allocation Regulations, 10 C.F.R. Parts 211 and 212 ("MPAR"), sought to achieve these goals by (1) requiring suppliers to distribute their supplies of allocated products in accordance with distribution patterns as they existed during a base period as defined in the regulations; and (2) controlling the maximum lawful price which suppliers could charge for regulated products.[2] Three sections of the regulatory scheme are pertinent to an understanding of the issues here. The first is section 211.9(a) which contains the obligation to supply. That regulation provides:

*Supplier/wholesale purchaser relationship:*

(1) Each supplier of an allocated product shall supply all wholesale purchaser-resellers and all wholesale purchaser-consumers which purchased or obtained that allocated product from that supplier during the base period as specified in Subparts D through K of this part.

10 C.F.R. § 211.9(a) (1980) ("Supplier/Purchase Rule").

The second is section 211.10 which prescribes the method of calculating the volume of product a supplier is obligated to furnish. That regulation provides, in essence, that a supplier's base period obligation for a particular allocated product equals the total of its purchasers' base period volumes, *i.e.,* the volumes of allocated product purchased or obtained during the appropriate base period ("Base Period Volume").[3] *See* 10 C.F.R. § 211.10 (1980). However, Base Period Volume does not include amounts of allocated product which have been obtained pursuant to in kind exchange agreements involving the same product, except to the extent that the amounts received under such exchange agreements exceed amounts supplied under those agreements. 10 C.F.R. § 211.-10(b)(2)(ii) (1980).[4]

Finally, section 212.83 provides that the maximum lawful price a supplier may charge for an allocated product is the sum of (i) the average May 15, 1973 selling price to the class of purchaser to which the customer belongs; (ii) permissible product cost increases; and (iii) permissible operating cost increases ("Maximum Lawful Price"). 10 C.F.R. § 212.83 (1980).

1. Congress enacted the EPAA in response to the failure of the President's voluntary program for the equitable allocation of product. The program failed, in large part, because the major oil companies refused to cooperate. *See, e.g.,* H.R.Rep. No. 531, 93d Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Ad.News, p. 2587–88.

2. The regulations at issue in this case are no longer in effect. They were abolished pursuant to Executive Order No. 12,287, which was issued by President Reagan on January 28, 1981. 46 Fed.Reg. 9909 (January 30, 1981).

3. The amount of product a purchaser is entitled to receive is also subject to the supplier's allocation fraction which is determined by dividing the supplier's total allocable supply in any given month by its base period obligations for that month. 10 C.F.R. § 211.10(b) (1980). Thus, if a supplier's total allocable supply in a particular month was only 90% of its base period obligations for that month, it would declare an allocation fraction of .9 and reduce the amount it supplied to each of its base period customers by 10%. *See* 10 C.F.R. § 211.10.

4. Section 211.10(b)(2)(ii) provides, in pertinent part:

Base period volume, however, does not include any amounts of an allocated product obtained pursuant to in kind exchange agreements involving a single product which are normal business operating procedures except the difference between the total amounts received under exchange agreements and the total amounts supplied to customers through exchange agreements.

10 C.F.R. § 211.10(b)(2)(ii).

In March and April of 1978, HTT and Exxon entered into three separate product exchange agreements, each of which obligated Exxon to supply HTT with 100,000 barrels of motor gasoline in exchange for HTT's supplying Exxon with 100,000 barrels of No. 2 fuel oil plus a cash quality differential. Exhibits A, B and C to the Affidavit of Robert S. Bramlett sworn to on December 12, 1980 ("Bramlett Affidavit"). All three exchange agreements were performed according to their terms between March and June of 1978.

At the time that the parties entered into and performed their exchange agreements, the base period for the allocation of motor gasoline was 1972. In 1979, however, the base period was changed so as to include the months of March through June of 1978. 44 Fed.Reg. 11,202 (February 28, 1979); 44 Fed.Reg. 42,549 (July 19, 1979). On February 28, 1979, HTT sent a telegram to Exxon advising Exxon that since transactions had occurred during the March 1978 base period, it would require its allocation for March 1979. HTT also requested information about the volume of gasoline which would be available as well as the price therefor. *See* Exhibit D to Bramlett Affidavit.

Exxon responded by advising HTT that it would not supply the gasoline requested because in its view exchange transactions did not create supply obligations under the MPAR. *See* Affidavit of Donald A. Campbell, sworn to May 14, 1981 at paras. 8, 9 ("Campbell Affidavit"), Exhibit B to Affidavits in Support of Defendant Exxon Corporation's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendant's Affidavits in Support"); Exhibit E to Bramlett Affidavit. HTT made similar demands for product on various occasions in 1979 and in 1980. Bramlett Affidavit at para. 8; Letter from Donald Craven to the Court, dated May 3, 1983 at 2.

Although on each occasion when product was requested Exxon had responded by declining to provide gasoline, in 1980 it advised HTT that, if HTT had pressing supply problems, it would consider supplying gasoline in exchange for heating oil and an appropriate cost differential. Campbell Affidavit at para. 9. HTT replied that it would consider furnishing heating oil, but only at the 1978 quality differential. *Id.* The parties never reached agreement and no gasoline was furnished. Thereafter, HTT sought the assistance of the Department of Energy.[5] This action for damages was commenced on May 1, 1980.

Plaintiff moves for partial summary judgment declaring that the MPAR obligated Exxon to supply it with gasoline in 1979 and 1980. In support of its motion, plaintiff argues (1) that the Supplier/Purchaser Rule, by its terms, clearly encompasses exchange agreements; (2) that the regulatory scheme supports that construction; and (3) that the Court should accord considerable weight to the administrative decisions

---

**5.** Following Exxon's refusal to supply it with gasoline, HTT filed a complaint with the Office of Special Counsel, the enforcement branch of the Department of Energy ("OSC"). The OSC issued an interim remedial order which concluded that supply obligations had been created by the exchange transactions and which required Exxon to immediately commence supplying HTT with its base period allocation. Exhibit A to the Affidavit of William W. Scott, sworn to on December 15, 1980 ("Scott Affidavit"). Exxon refused to comply and appealed to the Office of Hearings and Appeals ("OHA"). The OHA granted Exxon's request for a stay because the interim remedial order lacked sufficient findings of fact regarding irreparable harm and it remanded to the OSC to correct the procedural deficiencies. *Exxon Company, U.S.A.*, 3 DOE ¶ 82,069 at 84,693 (June 18, 1979), appended as Exhibit B to the Scott Affidavit.

Subsequently, the OSC issued a proposed remedial order in lieu of an amended interim remedial order. Exhibit E to the Scott Affidavit. The proposed remedial order concluded that a supplier/purchaser relationship had been created by the exchange transactions and that, since Exxon had refused to supply gasoline to HTT in 1979 and 1980, it had violated the regulations. *Id.* Exxon objected to the proposed remedial order and an enforcement proceeding was commenced.

HTT sought and obtained leave to participate in the enforcement proceeding, notwithstanding Exxon's objection. *See* Opposition of [Exxon] to Request to Participate by [HTT], filed September 9, 1980, Exhibit F to the Scott Affidavit. That proceeding is still pending.

which unanimously hold that exchange transactions create supply obligations.

Exxon argues that the Supplier/Purchaser Rule was not intended to apply to exchange transactions and that the regulatory scheme as a whole compels that conclusion. Exxon further argues that the agency interpretations upon which HTT relies are not entitled to deference because they are both belated and inconsistent with the agency's contemporaneous construction of the rule. For the reasons which follow, plaintiff's motion is granted.

■ The Supplier/Purchaser Rule obligates a supplier to supply a customer with product if that customer has "purchased or obtained" that product from that supplier during the base period. 10 C.F.R. § 211.-9(a). Two inferences can fairly be drawn from the face of the rule. First, since the words "or obtained" appear, it is clear that the regulation was intended to encompass transactions other than cash purchases. Moreover, since "obtain" means to gain or attain, the word "obtain" is clearly broad enough to encompass exchange transactions, such as those at issue where HTT obtained title to the product. *See id.; Pester Refining Co.,* 4 DOE ¶ 80,164 (1979).

Exxon's argument that the Supplier/Purchaser Rule does not apply to dissimilar product exchange transactions must be rejected.[6] Not only has Exxon failed to proffer any authority in support of that proposition but the authority that does exist is to the contrary.[7] The administrative interpretations have consistently held that unlike product exchanges such as those at issue are subject to the *supply* allocation regulations. *See, e.g.,* Interpretation 1981–14, 46 Fed.Reg. 27,298 (May 18, 1981) ("Northville Interpretation"); Interpretation 1980–39, 45 Fed.Reg. 76,045 (November 17, 1980) ("Amoco Interpretation"). Moreover, since the parties clearly intended to pass title to the products exchanged, there can be no merit to Exxon's claim that what would otherwise clearly be a sale should not be so regarded merely because the parties may have entered into the transaction to relieve short term operational problems. *See* Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment at 18–20.

Furthermore, other provisions in the regulatory scheme also support the conclusion that Exxon was obligated to supply product to HTT in this case. For example, the definitions of "supplier" and "wholesale purchaser-reseller" are clearly broad enough to encompass exchange partners.[8]

6. Exxon argues that since a consignment is shown as an example in the definition contained in 10 C.F.R. § 211.51 that the word "obtained" must be construed so as to apply to consignments and not exchanges. Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment at 19 ("Defendant's Memorandum"). That argument is not persuasive. The fact that a consignment is set forth as an example in no way limits the scope of the language used, which is clearly broad enough to include an exchange where title passes. Indeed, if anything, the use of that example, supports plaintiff's position. If the word "obtained" encompasses consignment transactions where title does not pass until the product is resold, it must of necessity apply to exchange transactions where title passes immediately. *See infra* n. 8; Exhibits A, B and C to the Bramlett Affidavit.

7. Exxon further argues that, since exchanges are so unlike sales, if the agency had intended to encompass them within the Supplier/Purchaser Rule it would have done so expressly as it did in the supplier/purchaser rule governing

crude oil. Defendant's Memorandum at 19–20; 10 C.F.R. § 211.63(b) (1980). It also argues that the agency had good reason to treat crude oil and product exchanges differently, to wit, that crude oil exchanges are a basic element of the crude oil distribution scheme whereas product exchanges are geared to dealing with temporary situations. Defendant's Memorandum at 35–36. However, "spot" sales for cash are also designed to deal with temporary situations. Nevertheless they are clearly encompassed by the Supplier/Purchaser Rule. Ruling 1974–25, 39 Fed.Reg. 32,901 (September 12, 1974). Thus the temporary or non-temporary nature of the exchange has no relevance to the applicability of the Supplier/Purchaser Rule.

8. "Supplier" is defined as any firm which "supplies, sells, *transfers or otherwise furnishes* (as by consignment) any allocated product . . ." 10 C.F.R. § 211.51 (1980) (emphasis added). "Wholesale purchaser-reseller" is defined as any firm which "purchases, *receives through transfer, or otherwise obtains* (as by consignment) an allocated product and resells or other-

Even more significantly, 10 C.F.R. § 211.-10(b)(2)(ii) expressly excludes from a purchaser's Base Period Volume product obtained through an exchange of equal volumes of *the same product.* The fact that equal volume exchanges of the same product were specifically excluded affords a strong inference that dissimilar exchanges which were not so excluded are part of the Purchaser's Base Period Volume and are consequently part of the supplier's base period obligation.

Exxon also relies on sections 211.23 and 211.25(b) which provide as follows:

211.23. Nothing in this part is intended to exclude or supersede exchange or borrow/payback operations which are normal operating procedures provided these procedures are not used to circumvent the intent of this part.

10 C.F.R. § 211.23 (1980).

211.25(b). In order to alleviate imbalances, suppliers may make normal business exchanges among themselves.

10 C.F.R. § 211.25(b) (1980).

This reliance is misplaced. While these *regulations do encourage suppliers to enter* into exchanges, they do not purport to insulate them from the supply obligations which may arise therefrom. *See* Northville Interpretation, 46 Fed.Reg. 27,298; Amoco Interpretation, 45 Fed.Reg. 76,045. Moreover, even assuming arguendo that these regulations could be construed as exempting exchange transactions from the Supplier/Purchaser Rule, these regulations so construed would be in conflict with section 211.9(a). That conflict would have to be resolved in favor of section 211.9(a). The regulations specifically provide that, where there is an inconsistency between a subpart F provision, wherein section 211.9(a) is contained, and a subpart A provision, such as sections 211.23 and 211.25(b), the provisions of subpart F shall prevail. 10 C.F.R. § 211.101(a) (1980).

Finally, imposing supply obligations on exchange transactions is consistent with the objectives of the statutory scheme, to wit, insuring the equitable distribution of product and preserving the competitive viability of independent marketers. *See* 15 U.S.C. § 753(b)(1)(D) and (F). Exchanges are a common method of distributing product in the petroleum industry. Affidavit of J. Roger Chenoweth, sworn to on May 6, 1981, at para. 3, Exhibit C to Defendant's Affidavits in Support; Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment at 4. Indeed, as much as thirty-six percent of a purchaser-supplier's monthly supply of product can come from such agreements. Bramlett Affidavit at para. 7. If such large volumes of product were excluded from Base Period Volume, base period distribution patterns would be distorted and purchaser-suppliers would experience shortages which could both jeopardize their ability to compete and adversely impact their customers' ability to obtain product. By imposing supply obligations on dissimilar exchanges these consequences are avoided. *See* Amoco Interpretation, 45 Fed.Reg. 76,045; *see also* Ruling 1974–25, 39 Fed. Reg. 32,901 (September 12, 1974).

Finally, *every branch of the Department* of Energy which has considered the question has concluded that exchange agreements create supply obligations. The Office of the General Counsel of the Department of Energy, which is responsible for interpreting the MPAR, has issued an interpretation which concludes that an exchange of gasoline for No. 2 heating oil creates a mandatory supplier/purchaser relationship. Northville Interpretation, 46 Fed.Reg. 27,-298; Amoco Interpretation, 45 Fed.Reg. 76,-045. Further, the Economic Regulatory Administration, which is charged with promulgating the MPAR, rejected a request by Chevron, U.S.A., Inc. to amend the MPAR so as to provide that exchanges would be exempt from the Supplier/Purchaser Rule unless the parties agreed in writing that the transaction created purchase rights and supply obligations. Letter to Paul M. Premo, Chevron, U.S.A., Inc. from F. Scott Bush, Assistant Administrator, Regulations and Emergency Planning, Economic Regu-

wise transfers it to other purchasers." *Id.*     (emphasis added).

latory Administration, dated July 31, 1980, Exhibit C to Index of Authorities in Support of Plaintiff's Memorandum of Law in Support of its Motion for [Partial] Summary Judgment (hereinafter "Plaintiff's Index of Authorities"); Letter to Office of General Counsel of DOE from Paul M. Premo, Chevron, U.S.A., Inc., dated June 3, 1980, Exhibit D to Plaintiff's Index of Authorities.[9] Moreover, the Office of Hearings and Appeals, the adjudicative branch of the Department of Energy ("DOE"), also has indicated that exchanges create supply obligations when title to product is transferred. *See Time Oil Co.,* 1 FEA ¶ 20,701 (1974); *see also Pester Refining Co.,* 4 DOE ¶ 80,164 (1979); Ruling 1974-21, 39 Fed.Reg. 24,359 (July 2, 1974).

Exxon contends, however, that the Northville and Amoco Interpretations are not entitled to deference both because they were rendered more than six years after the promulgation of section 211.9 and because they are inconsistent with the agency's contemporaneous and longstanding practical construction of the regulation. In support of its contention Exxon has proffered the affidavit of Robert K. Huffman, which affidavit states that the affiant had several telephone conversations with Gordon W. Allott, Jr., a former Regional Counsel of the Federal Energy Office ("FEO"), a predecessor of the DOE, who told him that, on at least one occasion in 1974, a senior official of the FEO's Office of General Counsel, David Wilson, told him that the amendments to the MPAR should not be drafted so as to impose supply obligations as a result of product exchanges during the base period. The affidavit further asserts that Mr. Allott advised the affiant that, while acting as Regional Counsel, he consistently took the position that the MPAR

did not impose supply obligations arising out of product exchanges during the base period.[10] Affidavit of Robert K. Huffman, sworn to February 12, 1982, at para. 2, Exhibit A to Affidavits in Support of Defendant Exxon Corporation's Supplemental Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendant's Affidavits in Support of Supplemental Memorandum").

Exxon also has submitted the affidavits of Gary Gisser, Executive Vice President of Supreme Petroleum Corporation, and Kerry R. Brittain, Attorney for Union Pacific Corporation, which affidavits state that the affiants were advised by DOE officials that "the allocation regulations did not impose supply obligations on account of product exchanges during the base period." Exhibits B and C to Defendant's Affidavits in Support of Supplemental Memorandum. Finally, Exxon also has proffered the affidavits of other industry members, which affidavits state, *inter alia,* (1) that the regulations were consistently understood as not applying to like or unlike product exchanges of equal volumes; (2) that all such exchanges that occurred during the base period were excluded in determining the Supplier's supply obligations; (3) that the DOE and its predecessor agencies, the Federal Energy Administration and the FEO, audited the company's compliance with the MPAR; and (4) that at no time did the agency's auditors take issue with the company's treatment of product exchanges or inform the company that unlike product exchange gave rise to supply obligations. *E.g.,* Affidavit of Larry C. Ross, sworn to May 5, 1981, Exhibit F to Defendant's Affidavits in Support. This argument lacks merit.

**9.** That request in itself constitutes strong evidence that industry members believed that exchanges of the type here at issue created a supply obligation and undercuts Exxon's claim that the industry was not adequately apprised of the scope of the Supplier/Purchaser Rule. See discussion *infra.*

**10.** Mr. Allott refused to testify by affidavit or deposition without the consent of the DOE

since, in his view, 10 C.F.R. § 202.22 prohibited him from doing so without the agency's prior approval. Letter from Gordon L. Allott, Jr. to Donald B. Craven, dated February 2, 1982, Attachment A to the Affidavit of Robert K. Huffman, Exhibit A to Affidavits in Support of Defendant Exxon Corporation's Supplemental Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment.

■ Agency interpretations are entitled to deference provided that they constitute a reasonable construction of the regulation and are not inconsistent with other regulations and rulings by the agency.[11] *UPG, Inc. v. Edwards,* 647 F.2d 147 (Em. App.1981). For the reasons previously stated, the Court finds that the Northville and Amoco Interpretations are entirely consistent with the MPAR and the enabling statute and are not plainly erroneous. Moreover, they are consistent with other regulations and with the agency's prior rulings. *See, e.g.,* 10 C.F.R. §§ 211.51, 211.-10(b)(2)(ii), 211.23, 211.25; *Pester Refining Co.,* 4 DOE ¶ 80,164 (1979); *Time Oil Co.,* 1 FEA ¶ 20,701 (1974).

The Court is not persuaded that Exxon's submissions have established that the DOE ever took a position contrary to that expressed in the Northville and Amoco Interpretations. None of the affidavits submitted by Exxon states that any *DOE employee* ever told anyone that *unlike* product exchanges do not give rise to supply obligations. Indeed, when Messrs. Gisser and Brittain were asked by HTT whether the allegedly inconsistent statements were made with reference to a like or unlike product exchange, each affiant stated that, while he could not recall, he believed that it was "probably" a like product exchange. *See* Affidavit of John B. Williams, sworn to March 16, 1982. Since like product exchanges are specifically excluded by the

allocation regulations, these affidavits are essentially irrelevant.

■ Moreover, the fact that other industry members did not treat unlike exchanges as giving rise to supply obligations is also irrelevant in the absence of evidence that those understandings resulted from advice given by the DOE. That evidence does not exist. Accordingly, the Court concludes that the Northville and Amoco Interpretations are entitled to deference.[12] *See Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *Pennzoil Co. v. United States Department of Energy,* 680 F.2d 156 (Em.App.1982); *UPG, Inc. v. Edwards,* 647 F.2d 147 (Em. App.1981). Since the objectives of the enabling statute, the regulations and the administrative decisions all compel the conclusion that exchanges create supply obligations, the Court holds that HTT obtained product within the meaning of the Supplier/Purchaser Rule when it received gasoline from Exxon in 1978.

Exxon next argues that, to the extent that section 211.9 encompasses exchanges, it is unenforceable because the DOE never gave adequate notice to members of the industry that exchanges would give rise to supply obligations and therefore deprived members of the industry of their right to comment on the proposed regulations, in violation of sections 553(b)(3) and (c) of the Administrative Procedure Act, 5 U.S.C. § 553(b)(3) and (c) (1982).

---

11. So long as these criteria are met, the fact that the interpretations were not issued contemporaneously with the promulgation of the regulation is of no consequence.

12. Defendant also moved to defer consideration of plaintiff's motion for partial summary judgment so that it might engage in discovery of the agency's contemporaneous construction of the Supplier/Purchaser Rule. On April 7, 1981 the Court issued an order which provided that Exxon's motion would be granted only if it could establish (1) that the regulation is ambiguous; and (2) that the DOE construed the regulation inconsistently prior to the transactions in issue. *Hydrocarbon Trading and Transport Company, Inc. v. Exxon Corp.,* 89 F.R.D. 650, 656 (S.D.N.Y.1981). Exxon has failed to meet that burden. The Court finds that the Supplier/Purchaser Rule is not ambiguous. Moreover, the Court

further finds, that Exxon has failed to establish that the DOE ever construed the Supplier/Purchaser Rule inconsistently prior to the transactions in issue. In short, Exxon has failed to demonstrate that the Northville and Amoco Interpretations were preceded by "extraordinarily confused and contradictory agency interpretations." *See Sauder v. Dep't of Energy,* 648 F.2d 1341, 1346 (Em.App.1981).

It follows that its reliance on *Standard Oil Co. v. Dep't of Energy,* 596 F.2d 1029 (Em.App. 1978), is misplaced. *See Pennzoil Co. v. United States,* 680 F.2d 156 (Em.App.1982); *Sauder v. Dep't of Energy,* 648 F.2d 1341 (Em.App.1981); *UPG, Inc. v. Edwards,* 647 F.2d 147 (Em.App. 1981). Accordingly, Exxon's motion to defer consideration of plaintiff's motion pending contemporaneous construction discovery is denied. *See* Transcript of Oral Argument at 18–19.

The short answer to this claim is that Exxon itself clearly understood that the Supplier/Purchaser Rule encompassed exchange transactions. In its 1974 comments regarding the proposed revisions to the MPAR, Exxon stated, in connection with 10 C.F.R. § 211.10(b)(2)(ii):

> Section 211.10(b)(2)(ii) states that . . . "Base period volume, however does not include any amounts of an allocated product obtained pursuant to in kind exchange agreements involving a single product which are normal business operating procedures." *This will force dissimilar product exchange agreements that were in effect between companies during the base period to be treated as mandatory buy/sell arrangements for the duration of the program.* Since many dissimilar product exchanges are used simply as a means of providing spot inventory adjustments, they should not be treated as mandatory buy/sell arrangements.

Exhibit I to Defendant's Appendix of Exhibits (emphasis added).

In the face of these comments, Exxon may not now claim that it and others in the industry did not and could not have known that the regulations encompassed exchanges of unlike products. It follows that there is no merit to Exxon's claim that notice to the industry was inadequate.[13]

Finally, Exxon contends that, assuming arguendo that the MPAR imposed a valid and enforceable obligation to supply HTT with gasoline in 1979 and 1980, it was relieved of that obligation because the price regulations required HTT to tender fuel oil in return and HTT never did so.

It should be noted at the outset that Exxon may well be estopped from now contending that HTT's failure to tender heating oil was a condition precedent to its duty to perform. Exxon consistently took the position that exchanges did not create supply obligations and never even suggest-

ed that heating oil be tendered for the gasoline until sometime in 1980. *See Ohio and Mississippi Railway Co. v. McCarthy,* 96 U.S. 258, 24 L.Ed. 693 (1878); *Rode & Brand v. Kamm Games, Inc.,* 181 F.2d 584 (2d Cir.1950); *Southwestern Electric Power Co. v. Local Union No. 738,* 293 F.2d 929 (5th Cir.1961); *Holt Marine Terminal, Inc. v. United States Lines,* 472 F.Supp. 487 (S.D.N.Y.1978); Exhibit E to Bramlett Affidavit. However, the Court need not reach that issue because it is clear that Exxon's argument must be rejected on the merits.

Section 212.83 of the MPAR defines the Maximum Lawful Price a supplier may charge for regulated products as (i) the average May 15, 1973 selling price to the class of purchaser to which the customer belongs; and (ii) permissible increases in the supplier's product and operating costs since 1973. 10 C.F.R. § 212.83 (1980).

A "class of purchaser" is defined as:

> Purchasers to whom a person has charged a comparable price for comparable property pursuant to customary price differentials between those purchasers and other purchasers.

10 C.F.R. § 212.31 (1980). The term "customary price differential" means:

> [A] price distinction based on a discount, allowance, add-on, premium and an extra based on a difference in volume, grade, quality, or location or type of purchaser, *or a term or condition of sale or delivery.*

*Id.* (emphasis added).

Exxon contends that its price to its exchange partners reflects a customary price differential which was based on an important term or condition of sale, to wit, the return of heating oil and a quality differential. It therefore argues that the class of purchaser to which HTT belongs consists of those firms with which it exchanged gasoline for heating oil plus a quality differential on or prior to May 15, 1973.[14]

---

**13.** In view of this awareness, Exxon may indeed lack standing to raise this issue.

**14.** While HTT argues that it is not a member of an exchange class of purchaser because it had

no obligation to recreate the exchange, the Court need not reach that issue since it concludes that Exxon's argument based on the price regulations lacks merit. *See U.S.A. Petroleum Corp.,* 5 FEA ¶ 80,555 (1977), *aff'g In-*

Having defined the class of purchaser to which HTT belongs, Exxon next argues that, since the regulations define "price" as "any consideration for the sale of any property . . . regardless of form," and since the return of heating oil and a quality differential was the consideration for the gasoline exchanged on May 15, 1973, its May 15th base price for the gasoline is an equal volume of heating oil and the May 1973 quality differential. *Id.* Accordingly, it concludes that since it was entitled to charge HTT its May 15, 1973 base price plus its permissible product and non-product cost increases, and since HTT failed to tender heating oil in return for the gasoline, HTT failed to pay Exxon's Maximum Lawful Price, thus relieving it of any obligation to perform.[15]

This argument distorts the regulatory scheme. Part 211 of the MPAR governs the allocation of petroleum products. Part 212 governs the Maximum Lawful Price a supplier can charge for a regulated product. It is undisputed that, at the time of the exchanges in 1978, No. 2 heating oil was not subject to the allocation regulations. Accordingly, HTT was under no obligation to continue to supply Exxon pursuant to Part 211. However, under Exxon's view of the price regulations, HTT was required to recreate the exchange each time it demanded its supply of allocated product, a construction which, of necessity, would impose a supply obligation on HTT that would not otherwise exist under Part 211. The Court concludes that it would not be consistent with the statutory scheme to construe the pricing regulations so as to impose supply obligations.

This holding is consistent with analogous agency interpretations. Although there are no administrative decisions directly on

point, DOE interpretations of the supplier/purchaser rules for both refined products and crude oil support the conclusion that exchanges need not be recreated. *See, e.g.,* Northville Interpretation, 46 Fed.Reg. 27,-298; Amoco Interpretation, 45 Fed.Reg. 76,-045; Ruling 1974–21, 39 Fed.Reg. 24,359 (July 2, 1974); *U.S.A. Petroleum Corp.,* 5 FEA ¶ 80,555 (1977); *Crystal Oil Co.,* 3 FEA ¶ 80,514 (1975). Exxon's reliance on Interpretation 1974–2 is misplaced since, to the extent that that interpretation holds that a non-allocated product must be supplied in return for an allocated product, it appears to have been overruled. *See* Ruling 1974–21, 39 Fed.Reg. 24,359 (July 2, 1974); *see also U.S.A. Petroleum Corp.,* 5 FEA ¶ 80,-555 (1977); *Crystal Oil Co.,* 3 FEA ¶ 80,514 (1975).

Finally, Exxon itself identified another compelling reason for rejecting the argument that the price regulations mandate the return of heating oil, to wit, that the forced recreation of exchanges at a time when the circumstances prompting their making no longer exist would undermine the goals of the MPAR. Exxon's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment at 32–35. Under Exxon's theory of the price regulations, HTT would not have been entitled to its allocation of gasoline if it could not have tendered heating oil to Exxon. Thus, if HTT were short on heating oil in March, April and May of 1979 and 1980, it could not have purchased its allocation of gasoline for cash even though the Supplier/Purchaser Rule entitled it to an allocation. This would clearly impair the value of HTT's supply allocation right and would vitiate the protection that the MPAR was designed to afford. Moreover, under this view, Exx-

terpretation 1976–20, 42 Fed.Reg. 7940 (February 8, 1977); *Greenbelt Consumer Services, Inc.,* 1 FEA ¶ 20,211 (1974).

**15.** Exxon also moves to defer consideration of plaintiff's motion for partial summary judgment because it has submitted the pricing issues to the DOE in connection with the enforcement proceeding which is now pending. *See supra* n. 5. That motion is denied. The issues raised by plaintiff's motion concern the

proper construction of a regulatory scheme which is traditionally a function of the Court. Moreover, counsel for plaintiff represented to the Court that the administrative enforcement proceeding, which was commenced in March 1979, is still in the discovery stages. *See* Transcript of Oral Argument at 11–12. Thus a deference pending a completion of the enforcement proceeding will result in substantial delay.

on would have been required to accept heating oil in consideration of the gasoline even though it might have had no need for the heating oil or no refining capacity available at that time.

Accordingly, plaintiff's motion for partial summary judgment is granted.

It is SO ORDERED.